EL PUEBLO DE PUERTO RICO, apelado, *v.* CECILIO CASTRO GARCÍA, acusado y apelante.

*Número:* CR-79-89      *Resuelto:* 28 de enero de 1981

*Miguel T. Morales Adames,* abogado del acusado; *Héctor A. Colón Cruz, Procurador General, y Reina Colón de Rodríguez, Procuradora General Auxiliar,* abogados de El Pueblo de Puerto Rico.

### SENTENCIA

La víctima, Aurelia Fuentes, y el apelante eran casados. Se separaron. Estando separados, Aurelia acudió a las fiestas patronales de Loíza en unión de dos amigas, Enid e Isabel Navarro. Declaró una de las amigas, que llegaron al pueblo como a las siete de la tarde y alrededor de las diez de la noche se les unió un amigo de nombre Miguel Solís. Éste, como a las doce, las invitó a un kiosko. Solís ordenó cerveza para los cuatro. Al momento entró el apelante "y sin previo aviso, súbitamente, empezó a hacerle disparos a Aurelia, cayendo ésta al piso". "[E]ntre el apelante y su víctima no medió discusión ni altercado alguno habiéndose producido el hecho instantáneamente y sin tiempo para nada." E.N.P., pág. 4.

Miguel Solís declaró que conoció a las tres damas esa noche; que sentía simpatías por Enid y que las convidó a

tomar unas cervezas; que no oyó discusión alguna previa a los hechos imputados al apelante.

El dueño del establecimiento declaró que el apelante visitó el kiosko como a las nueve de la noche y al retirarse le dijo que volvería más tarde. Declaró, además, que al llegar Solís pidió cuatro cervezas "y mientras él las despachaba, sintió un disparo y cuando se incorporó vio al apelante disparando contra Aurelia Fuentes López, quien yacía en el piso, disparando el apelante varias veces más". E.N.P., pág. 6. El forense declaró que cuatro de los plomos recibidos por la víctima fueron por la espalda.

El apelante declaró explicando las relaciones entre él y su esposa y la separación surgida al cabo de algún tiempo de casados. Manifestó que la noche de los hechos estaba en las fiestas patronales de Loíza y al pasar por el kiosko decidió entrar. "Que al entrar al kiosko vio a su mujer sentada con un hombre . . . quien le tenía un brazo echado por el hombro y el otro brazo al nivel del muslo, como si tuvieran las manos cogidas. Que él se percató [de] que en el negocio [había] otras personas; que se [le] nubló su entendimiento, que perdió noción del tiempo y de sitio, sacó su revólver y disparó".

El fiscal presentó prueba de refutación al efecto de que el apelante, en ocasión anterior, le había propinado una bofetada a su esposa, que éste estuvo enfermo y que su esposa (la víctima) lo cuidó; que en otra ocasión el apelante le informa a una prima de la víctima que le iba a cortar la cara para que los estudiantes se rieran de ella y a otra persona le manifestó que "si él sabía algo de Yeya [la víctima], la mataba". Los testigos de refutación estaban todos emparentados con la víctima.

La defensa presentó el testimonio del apelante para refutar esta prueba.

La contención del apelante en su primer apuntamiento de que los hechos establecidos por la prueba de cargo no constituyen el delito de asesinato en segundo grado y sí el de homi-

cidio, carece de mérito. La actuación del apelante al disparar contra su esposa de súbito y sin que mediaran palabras o discusión alguna no justificaba en forma alguna un veredicto de homicidio. Funda su contención de que hubo una provocación en la frágil base de que al llegar el apelante al kiosco donde se encontraban reunidos su esposa y unos amigos, encontró a ésta cogida de las manos con otro hombre. (¹) Aparte de que la prueba de cargo estableció que si algún interés romántico tenía el hombre que acompañaba a las damas era hacia Enid Navarro, este hecho no constituye suficiente provocación para convertir el acto criminal del apelante, quien disparó cuatro de las balas que atravesaron el cuerpo de la víctima por la espalda, en un homicidio voluntario. Lo que se estableció claramente fue un caso de asesinato. "Asesinato es dar muerte a un ser humano con malicia premeditada", dispone el Art. 82 del Código Penal. Y los elementos constitutivos de esa malicia pueden concebirse en el momento mismo del ataque que causa la muerte.

Lo expresado dispone del segundo apuntamiento. (²) Es claro que la prueba justificaba la inferencia de malicia premeditada. Nada en la prueba que tuvo ante sí el jurado justificaba unas instrucciones sobre homicidio. Ver Art. 85 del Código Penal.

En cuanto al tercer error —la improcedencia de admitir la prueba de refutación presentada por el Ministerio Público— basta decir que, aun si consideráramos que constituye error su admisión, el mismo no podía en forma alguna afectar el veredicto rendido, pues el propio apelante admite los hechos y sólo disputa la clasificación del delito. Siendo la prueba tan

---

(¹) El único testigo que declaró sobre este hecho lo fue el apelante; por otro lado el hombre que acompañaba a las damas declaró que "sentía simpatías amorosas por Enid [Navarro]". E.N.P., pág. 5.

(²) Dispone así el segundo apuntamiento:

"Que el Juez no estuvo justificado en impartir instrucciones sobre asesinato dado a que la prueba no justificaba la inferencia de malicia premeditada ni deliberación."

clara y directa, ciertamente no tuvo consecuencia alguna la admisión de la prueba de refutación.

Se confirma la sentencia apelada.

Así lo pronunció y manda el Tribunal y certifica el Secretario. El Juez Asociado Señor Rigau disiente en opinión separada.

(Fdo.) Ernesto L. Chiesa

*Secretario*

—O—

Opinión disidente emitida por el Juez Asociado Señor Rigau.

San Juan, Puerto Rico, a 28 de enero de 1981

Respetuosa y fraternalmente disiento. Cuando un juez se propone hacer justicia —propósito que para él debe ser cotidiano— y no interesa probar que es liberal o conservador, estricto o leniente, la forma en que ha de resolverse el caso dependerá mayormente de su interpretación de los hechos. [1]

Desde luego, la ley ha de aplicarse. Pero la ley está ahí, escrita, inmutable, uniforme, silenciosa, igual para todos. Es el caso, esto es, sus hechos particulares y la aplicación a esos hechos por el juez de la ley, lo que le dará a ésta vida, calor y vivencia. Ese proceso del juzgador es el que hace de la ley una realidad en la vida humana. Rudolf Von Ihering lo ha expresado en esta forma: "[E]l Derecho existe para realizarse. La realización es la vida y la verdad del Derecho; es el Derecho mismo. Lo que no pasa a la realidad, lo que no existe más que en las leyes y sobre el papel, no es más que un fantasma de Derecho, palabras vacías." [2]

---

[1] Sincera y enfáticamente declaro que no creo que la opinión mayoritaria obedezca a ninguno de esos móviles. Meramente estoy exponiendo mi sentir personal, como se verá en el curso de la Opinión.

[2] *L'esprit du Droit romain dans les diverses phases de son développement*, citado por Castán en su libro *Teoría de la Aplicación e Investigación del Derecho*, Madrid, Instituto Editorial Reus, 1947, pág. 11.

A su vez, Castán lo expresa así: "[E]l Derecho es para la vida o, más exactamente, que tiene por fin la realización de la justicia en la vida." (³)

En el caso de autos están ahí presentes y disponibles dos disposiciones específicas de nuestra Ley Penal. La primera es la que define el delito de asesinato y la segunda define el delito de homicidio. Más adelante examinaremos sus textos específicos. ¿Cuál de esas dos disposiciones ha de sancionar la conducta del apelante? Examinemos esa conducta. Veamos los hechos del caso y eso nos llevará casi de la mano al fallo que, en justicia, entiendo que corresponde.

El apelante era policía. Llevaba 21 años en el servicio, con un récord limpio. Era casado y tenía dos hijos. Su esposa tenía un hijo de otro hombre, concebido antes de su matrimonio con el apelante. Él sabía eso, y a pesar de ello, se casaron y vivieron con normalidad, procreando los otros dos hijos del matrimonio mencionados antes. Pasando el tiempo, surgieron desavenencias entre los cónyuges. Se separaron. Aparentemente él siguió tratando de reestablecer el hogar.

Estando así separados, en la madrugada de los hechos el apelante encontró a su esposa en un establecimiento público con otras personas y particularmente acompañada de un hombre con quien, todo parece demostrar, existía alguna relación amorosa. Estaban sentados en una mesa, el hombre le tenía un brazo por los hombros a la señora y las manos cogidas. El apelante disparó contra ella matándola. Antes de los disparos no mediaron palabras algunas.

El apelante fue acusado de asesinato en primer grado y convicto por un jurado de asesinato en segundo grado. Había testigos oculares y los hechos no están en controversia.

En apelación, se hacen los siguientes tres señalamientos de error: (1) Que la prueba desfilada no justifica un veredicto de asesinato en segundo grado y sí uno de homicidio; (2) que no procedía admitir la prueba de refutación presen-

---

(³) José Castán Tobeñas, obra citada, pág. 11.

tada por el fiscal; (3) que no estaba justificado impartir instrucciones sobre asesinato, ya que la prueba no justificaba dicho delito.

En vista de la forma como la opinión mayoritaria dispone de los señalamientos de error segundo y tercero, no los vamos a discutir en aras de la brevedad, ya que no es indispensable hacerlo. A diferencia de la opinión mayoritaria, creemos que se cometió el primer error señalado, y a discutirlo nos limitaremos.

El Código Penal dispone que asesinato es "dar muerte a un ser humano con malicia premeditada". Art. 82, Código Penal, 33 L.P.R.A. sec. 4001. El Código define el delito de homicidio en los siguientes términos: "Toda persona que matare a otra en ocasión de súbita pendencia *o arrebato de cólera* será sancionada con pena de reclusión por un término mínimo de un año y máximo de diez años." Art. 85, Código Penal, 33 L.P.R.A. sec. 4004. (Énfasis suplido.)

Como los hechos demuestran, se trata de un crimen pasional, producto de la irreflexión y no de una premeditación calculada y fría. El saldo de los hechos es el siguiente: una mujer, madre de tres menores, muerta; tres menores huérfanos y su padre sentenciado de 13 a 17 años de presidio.

Aunque no hay duda de que hay circunstancias en que el mero hecho de cometer la agresión mortal implica la malicia y la premeditación necesarias que constituyen el delito de asesinato, creemos que los hechos de este caso no demuestran premeditación alguna, sino más bien el arrebato de cólera, elemento constitutivo del delito de homicidio, según el Art. 85 antes citado. El acto del apelante fue la reacción inmediata, irreflexiva, ciertamente ilegal, pero no calculada ni preconcebida, sino la acción producto del arrebato de cólera ocasionado por el sentimiento del honor ofendido.

Entendemos que ante una situación concreta y real como la que este caso plantea, se cometió sin lugar a dudas un homicidio voluntario. Hubo intención de matar a un ser humano,

provocada, como dijimos, por la ofensa moral hecha al apelante pero sin que mediase la premeditación necesaria para que el acto constituyese asesinato. *Pueblo* v. *López Rivera*, 109 D.P.R. 160 (1979); *Pueblo* v. *Rodríguez Dapena*, 35 D.P.R. 431 (1926).

A esa realidad es que hay que aplicar la ley, no mecánicamente, sino atemperándola, sin violarla ni falsearla, a una situación humana y real. Eso es realizar la ley, esto es, hacerla realidad y justa; que no sea un mero "fantasma de Derecho", como dice Ihering.

Por las razones expresadas anteriormente, yo rebajaría la calificación del delito a homicidio, el cual conlleva una sentencia de 1 a 10 años de prisión.

Bajo esa situación de derecho, el apelante sería elegible a una sentencia suspendida, si la ameritase.

Si recordamos a los tres menores huérfanos de madre y privados de la compañía y ayuda material del padre, tal vez la amerite. Sobre esto no estamos haciendo recomendación específica alguna, sino meramente señalando un factor que podría considerarse.