# 2001 DTA 119

## TRIBUNAL DE CIRCUITO DE APELACIONES
## CIRCUITO REGIONAL VI DE CACUAS, HUMACAO Y GUAYAMA

EL PUEBLO DE PUERTO RICO
Apelado

v.

CARLOS MANUEL SUAREZ BENITEZ
Acusado-Apelante

Núm. KLAN-00-00594

San Juan, Puerto Rico, a 9 de febrero de 2001

Panel integrado por su Presidenta, la Juez Pesante Martínez,
y los Jueces Martínez Torres y Salas Soler

*Per Curiam*

## TEXTO COMPLETO DE LA SENTENCIA
### (EN RECONSIDERACION)

Mediante un recurso de apelación, recurre ante nos Carlos Manuel Suárez Benítez solicitando que revoquemos o modifiquemos una sentencia del Tribunal de Primera Instancia, Sala Superior de Caguas, que lo declaró culpable de asesinato en primer grado, tentativa de asesinato y violaciones a los Artículos 6 y 8 de la Ley Ndm. 17 del 19 de enero de 1951, según enmendada, mejor conocida como la Ley de Armas de Puerto Rico. Por los fundamentos que expresamos a continuación, se confirma la sentencia apelada.

### I

El 16 de diciembre de 1999, Carlos Manuel Suárez Benítez (Suárez) fue declarado culpable por un jurado de haber cometido los delitos de asesinato en primer grado, ██ tentativa de asesinato, ██ y haber violado los Artículos 6 y 8 de la Ley Número 17 de enero de 1951 (25 L.P.R.A. secs. 416 y 418), según enmendada, mejor conocida como la Ley de Armas de Puerto Rico. El 15 de marzo de 2000, el Tribunal de Primera Instancia, Sala Superior de Caguas, dictó sentencia condenando a Suárez a cumplir una pena de reclusión de 99 años por el delito de asesinato en primer grado, 10 años de reclusión por el delito de tentativa de asesinato, y 4 y 5 años de prisión, respectivamente, por la violación de los Artículos 6 y 8 de la Ley de Armas. Todas las penas se impusieron para cumplirse concurrentemente. El Tribunal de Primera Instancia también condenó a Suárez a pagar una pena especial de $300.00, según lo establecido en el Artículo 49C del Código Penal (33 L.P.R.A. sec. 3214). Sin embargo, tras la celebración de una vista sobre indigencia, el 2 de mayo de 2000, el Tribunal de Primera Instancia relevó a Suárez de la penalidad especial de $300.00 y dictó resolución al efecto.

No conforme con lo resuelto por el Tribunal de Primera Instancia, Suárez acudió oportunamente ante nos mediante recurso de apelación. El 10 de enero de 2000, dictamos sentencia en la que desestimamos el recurso porque en los lauros originales y en el expediente ante nos, no hay constancia de que Suárez hubiera notificado copia del escrito de apelación al tribunal apelado. Resolvimos en esa ocasión que a la luz de lo establecido en la Regla 194 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, y el inciso "A" de la Regla 24 del Reglamento del Tribunal de Circuito de Apelaciones, 4 L.P.R.A. Ap. XXII-A, el recurso de apelación no fue perfeccionado conforme a derecho, por lo que carecíamos de autoridad para intervenir en el mismo.

El 23 de enero de 2001, Suárez acudió ante nos mediante "*Moción Solicitando Reconsideración de Sentencia*". En dicha Moción se alegó el cumplimiento de las disposiciones de la Regla 194 de Procedimiento Criminal y la Regla 24 del Reglamento de este Tribunal. A tales efectos, se anejó a la moción copia de la cubierta del escrito de apelación, la cual aparece marcada como recibida el 25 de mayo de 2000, tanto en la Secretaría de este tribunal como en el tribunal apelado. ██ Se incluyó, además, junto a la moción, una declaración jurada suscrita por el señor Juan García en la que declaró haber presentado, el 25 de mayo de 2000, copia del escrito de apelación en la Fiscalía de Distrito de Caguas, en la Secretaría del Tribunal de Circuito de Apelaciones y luego copia sellada del documento al Tribunal de Primera Instancia, Sala Superior de Caguas.

Habiéndose probado por el apelante, el cumplimiento de las disposiciones de la Regla 194 de Procedimiento Criminal y el inciso "*A*" de la Regla 24 de nuestro Reglamento, acogemos la "*Moción Solicitando Reconsideración de Sentencia*" y procedemos a continuar con el proceso de apelación. ██ Contando con el beneficio de los alegatos de las partes, la exposición narrativa estipulada de la prueba y los autos originales del caso, pasamos a resolver según lo intimado.

### II

Los dos señalamientos de error planteados por el acusado-apelante (Suárez), alegan, en síntesis, que el Ministerio Público le violó el debido proceso de ley, tanto sustantivo como procesal, al ocultarle evidencia exculpatoria desde los inicios del proceso, y aún así, el tribunal no desestimó los casos. Señala también, como error, que el jurado no evaluó correctamente la prueba, ya que encontró culpable al acusado de cometer asesinato en primer grado, cuando la prueba desfilada fue la de un homicidio voluntario, razón por la cual el

veredicto fue contrario a derecho y a la prueba.

Primeramente atenderemos el segundo señalamiento de error, con el propósito de presentar un trasfondo amplio de los hechos. Luego de atendido dicho señalamiento, pasaremos a considerar el primer señalamiento de error, el cual va dirigido a la alegada violación del debido proceso de ley que le asistía al ahora acusado-apelante desde el inicio del proceso criminal en su contra.

### III

La prueba de cargo, en este caso, contó con los testimonios de María Alexandra Molina Rosario, María Judith Rosario Mercado, Edgar Morales Ayala, Federico Concepción Rivera, Carmen Judith Rivera Cotto, Agente Ulises Batalla Sánchez, Lourdes Fonseca y del Patólogo Francisco Cortés Rodríguez. La prueba de defensa contó con el testimonio del Agente Wilfredo Martínez Rodríguez y de Yadira Vázquez.

De la Exposición Narrativa Estipulada surge que el 29 de marzo de 1999, en horas tempranas de la noche, ocurrió un incidente de violencia en el Sector Las Carolinas de Caguas. El incidente comenzó cuando la hermana de la víctima, María Judith Rosario Mercado, su mamá, Juanita Mercado, sus tres hijos, María Alexandra, Víctor Manuel y Taineris, su compañero consensual, dos sobrinos y una vecina caminaban por el Sector Las Carolinas. Cuando iban "*por los buzones*", ▇ una joven de nombre Damaris llamó a María Alexandra y le dijo que bajara hasta la cancha, que la iba a esperar allí. María Alexandra siguió caminando junto a sus acompañantes y no se dirigió a la misma. En ese momento, pasó Rubén Castro en un carro gris de dos puertas con cristales ahumados y Damaris le dijo que fuera a buscar a Jackeline Cuadrado ("*Yari*"). El grupo que iba caminando se paró frente a la casa de Federico Concepción Rivera. Rubén, por su parte, se fue a buscar a "*Yari*", según lo solicitado. (E.N.P., pág. 26).

En ese momento, pasaba por el lugar Víctor Manuel Rosario Mercado (la víctima, tío de María Alexandra), preguntó qué pasaba y detuvo su carro en el medio de la calle. La joven Damaris le dijo que no se estacionara allí, sino en un solar vacío que quedaba cerca. La víctima se estacionó en reversa en dicho solar. (E.N.P., pág. 27).

De acuerdo al testimonio de la Sra. María Judith Rosario, simultáneamente llegó Rubén con "*Yari*", el acusado-apelante Carlos Manuel Suárez Benítez conocido como "*El Mono*" ▇ y otras personas. Las jóvenes que se encontraban allí, le gritaban palabras obscenas a María Alexandra. (E.N.P., pág.27). "*Yari*", por su parte, le señaló a María Alexandra el terreno vacío donde se encontraba estacionado Víctor Manuel Rosario Mercado. La pelea de las jóvenes María Alexandra y "*Yari*" comenzó en el terreno vacío y se unieron a la misma las otras jóvenes que se encontraban en el lugar. (E.N.P., pág. 28).

La Sra. María Judith Rosario y su mamá lograron separar a dos de las muchachas que estaban golpeando a María Alexandra. María Alexandra, por su parte, estaba golpeando a "*Yari*". (E.N.P., pág. 28). Señaló además esta testigo, que en ese momento alguien la haló por el pelo y cuando se volteó para el lado izquierdo, vio los pies de su hermano y a alguien con pantalones cortos detrás de él. Al subir la vista, vio algo brilloso, ▇ lo cual era un arma de fuego (E.N.P., pág. 31) en manos del acusado (E.N.P., pág. 45). La testigo indicó que hubo una detonación y que vio a Rubén Castro montado en su carro prendido y al acusado-apelante (Suárez, alias El Mono) corriendo hacia dicho carro. Tanto la Sra. Rosario como su hija corrieron hacia el carro para tratar de detenerlo, pero los intentos resultaron infructuosos. Luego, la Sra. Rosario solicitó ayuda para llevar a su hermano al hospital. (E.N.P., pág. 29). A preguntas del Fiscal, dijo que la pelea había sido exclusivamente entre mujeres y que su hermano, al momento de la pelea, estuvo con los brazos cruzados, sólo dijo que le quitaran a Alexandra a Yari que "*la iba a matar*" y que era una "*pelea de mujeres en la que no se metían hombres*". (E.N. P., pág. 30). Testificó, además, que aunque la visibilidad era poca, se podía ver y había dos postes de luz encendidos cerca del lugar. (E.N.P., pág. 31). A preguntas de la defensa, contestó que su hermano (la víctima) era una persona que conocía de armas y "*si le hubieran dado la oportunidad, sí se hubiera defendido. Pero mi hermano no tuvo oportunidad de defenderse*". (E.N.P., pág. 43).

El testimonio de la joven María Alexandra fue sustancialmente parecido al de la Sra. Rosario. Mencionó los nombres de las jóvenes que tuvieron participación en un momento dado en la pelea, incluyendo a la joven Jackeline Cuadrado. Testificó, además, que al momento de Rubén llegar con Jackeline, se encontraba también en el carro un joven en el asiento del pasajero y dos jóvenes más en el asiento trasero, los cuales no pudo identificar. (E.N.P., pág. 5).

Al llegar Jackeline al lugar, la víctima se encontraba recostado al lado derecho de su baúl con los brazos cruzados. Comenzó la pelea entre Jackeline y María Alexandra y luego se *"tiraron encima"* de esta última las otras jóvenes presentes en el lugar. ▪ En ese momento, la mamá, la abuela y la tía de la joven María Alexandra intervinieron en la pelea para separar a las jóvenes que estaban peleando. (E.N.P., pág. 6).

De acuerdo al testimonio de esta testigo, cuando terminó de pelear con la joven Jackeline, vio a Suárez salir de la parte de atrás del carro de Víctor Manuel (la víctima) y se le acercó a éste por el lado derecho. Víctor Manuel se encontraba recostado del lado derecho del baúl de su carro con los brazos cruzados. Suárez levantó sus manos y en ese momento la testigo escuchó una detonación. Su tío Víctor Manuel cayó al suelo y Suárez corrió hasta el carro de Rubén, el cual estaba encendido y con la puerta abierta. (E.N.P., pág. 7).

La joven persiguió a Suárez para tratar de *"aguantarlo"*, pero este se montó en el carro de Rubén. La joven trató de que no se escaparan agrediendo al Sr. Pacheco, quien conducía el vehículo. (E.N.P., pág. 7). Los ocupantes del vehículo se marcharon, incluyendo a Suárez. (E.N.P., pág. 8).

A preguntas de la fiscalía, la joven María Alexandra testificó que al momento de levantar a su tío para llevarlo al hospital, se cayó de la cintura de éste un arma de nueve milímetros. (E.N.P., pág. 9). Testificó además, que el acusado (Suárez) no tuvo ningún tipo de participación en la discusión que se llevaba a cabo en el lugar de los hechos. (E.N.P., pág. 9).

Del contrainterrogatorio de la defensa, surge, además, que la víctima no tuvo participación en la pelea. Estuvo siempre recostado del lado derecho del baúl de su vehículo, a lo único que se limitó fue a decir *"quítenle a María, que va a matar a Jackeline"*. Surgió, además, que la víctima se dedicaba al tiro al blanco en su tiempo libre, tenía muchas armas, era un buen tirador y trabajaba en una armería. (E.N.P., pág. 13). Testificó, también, la testigo María Alexandra que el día de los hechos no vio revólver, pero sí vio el gesto de cuando levantó la mano (Suárez) y se escuchó la detonación. (E.N.P., pág. 14). A preguntas de la defensa testificó, además, que el lugar donde ocurrió el incidente era oscuro, pero había visibilidad de dos postes que rodeaban el lugar. (E.N.P., pág. 21).

El tercer testigo del Ministerio Público lo fue el joven de 16 años Edgar Morales Ayala, novio de la hija de la víctima. Narró esencialmente los mismos hechos expuestos por las dos testigos anteriores. Testificó que vio al acusado llegar al lugar de la pelea, en el carro de Rubén (E.N.P., págs. 55-56) y que la víctima se encontraba recostado del baúl de su carro, con las manos cruzadas. (E.N.P., pág. 48). Que el acusado le disparó a la víctima por detrás de la oreja, por el lado derecho. Describió el arma que usó el acusado como un revólver, aniquelado con el cabo color marrón. (E.N.P., pág. 48) Testificó que sólo hubo un disparo, la víctima cayó al piso y el acusado salió corriendo hacia el carro de Rubén, el cual estaba encendido. (E.N.P, pág. 49). Luego se enteró que Federico Concepción Rivera también había sido herido por el acusado. (E.N.P, pág. 50). Este testigo señaló, a preguntas de la defensa, que la pelea era una de mujeres. (E.N.P., pág. 53).

El cuarto testigo de la fiscalía lo fue Federico Concepción Rivera, persona que resultó herido de bala en el incidente. Este joven vive frente al lugar donde ocurrieron los hechos. Testificó que la víctima (apodado *"Congo"*) se encontraba en el terreno vacío junto a su carro. (E.N.P., pág. 60). Señaló que la víctima pidió que separaran a María de Jackeline. (E.N.P., pág. 61). A preguntas de la fiscalía, no supo precisar si la pelea era entre hombres o mujeres. (E.N.P., pág. 61). Dijo, también, que cuando salió caminando sintió un impacto y que la última vez que vio a la víctima fue cuando estaba al lado del carro. (E.N.P., pág. 61). Testificó, además, que

Rubén se marchó del lugar en su carro y en compañía del acusado. (E.N.P., págs. 61-62). En el contrainterrogatorio, este testigo contestó en la afirmativa cuando el abogado defensor preguntó si había hombres o mujeres peleando. (E.N.P., pág. 64). Más adelante, durante el mismo contrainterrogatorio, a preguntas de la defensa referentes a si había hombres y mujeres peleando, más de treinta (30), el testigo contestó *"habían muchas, por eso no puedo decirte quiénes estaban y quiénes no estaban"*. (E.N.P., pág.65). También testificó que el acusado se encontraba en el lugar de los hechos, pero no supo decir la persona que había disparado. (E.N.P., pág. 65) Testificó que había focos por el área del incidente, pero que el lugar era oscuro. (E.N.P., pág. 67).

La cuarta testigo de la fiscalía lo fue Carmen Judith Rivera Cotto, vecina del lugar de los hechos. Describió la pelea que se suscitó el 29 de marzo de 1999 y dijo que la misma era entre mujeres. Testificó, además, que vio llegar al acusado al lugar, que escuchó una detonación y que la víctima cayó al suelo. El acusado salió corriendo y se fue con *"el del carro gris"*. (E.N.P., pág. 69). Señaló que el acusado se encontraba cerca del lugar de los hechos, específicamente dijo: *"cerca, él salió. Fue tan y tan rápido y disparó tan rápido."* (E.N.P., pág. 70).

La esposa de la víctima, Sra. Lourdes Fonseca, testificó básicamente lo mismo que la Sra. María Judith Rosario Mercado. Aclaró que su esposo era un asiduo al club de tiro y que todas las armas las tenía con licencia. La testigo se encontraba en el lugar de los hechos, intervino para separar a una de las jóvenes que estaba *"encima de su cuñada"*. En ese momento, llevó a la joven contra la pared y escuchó la detonación. La joven le dijo *"suéltame, que ya lo mataron"*. (E.N.P., pág. 91). Esta testigo también mencionó que la pelea fue entre mujeres. (E.N.P., pág. 92).

El sexto testigo de la fiscalía fue el Agente Ulises Batalla quien explicó los pormenores de la investigación del caso en sus etapas preliminares.

De acuerdo al testimonio del Patólogo Francisco Cortés Rodríguez (patólogo que realizó la autopsia a la víctima), señaló que la víctima presentaba una herida de bala localizada en la región mascoudea derecha, detrás de la oreja en la parte interior. Según la herida, hubo menos de dos pies entre la boca del cañón del arma y el blanco. La trayectoria que recorrió la bala fue de derecha a izquierda, con salida detrás de la oreja izquierda. (E. N.P., pág. 95). Señaló, además, el patólogo, que lo más importante que el cuerpo presentaba era una herida de bala y que no había evidencia de abrasiones o contusiones en el cuerpo. (E.N.P., pág. 96).

El primer testigo de defensa lo fue el Agente Wilfredo Martínez Rodríguez. Este testificó acerca del informe Tipo 1 que rindió sobre los hechos, básicamente leyó lo dicho por ese informe. La persona querellada, en ese caso lo fue la Sra. Wanda Rivera López, madre del menor que resultó herido con la bala disparada el día de los hechos. Señala el informe (tomado el día de los hechos) en sus partes pertinentes que *"dos individuos de sexo masculino, los cuales puede identificar la querellante, se encontraban en una pelea frente a su casa y uno de los individuos saca un arma de fuego, hace un disparo y logra alcanzar al joven perjudicado en el área maxoide con entrada y no salida, y fue transportado por la querellante al Hospital Regional de Caguas. Allí fue atendido por el Dr. Fernández, quien indicó que sería referido a cirugía para extraerle dicho proyectil."*

El agente añadió que la persona que ocasionó el disparo se montó en un vehículo en el que lo estaba esperando otro individuo. El vehículo era pequeño. Los individuos se marcharon del lugar sin dejar rastro alguno. Dicha querella guarda relación con un informe de persona muerta. Tiene el mismo número de querella y el Agente Batalla tiene a cargo la investigación. (E.N.P., pág. 99). A preguntas de la fiscalía, este testigo habló sobre la querella radicada por la Sra. María Rosario Mercado y en la cual consta como perjudicado el Sr. Víctor M. Rosario Mercado. (E.N.P., pág. 100).

La segunda y última testigo de la defensa fue la Sra. Yadira Vázquez. Testificó, en síntesis, que era la esposa de Rubén Castro Oquendo y que intervino en la pelea, ya que María (Alexandra) estaba golpeando a

Jackeline, junto a su mamá, abuela y familia. Rubén intervino también en la pelea, y en ese momento, la víctima también intervino. Testificó que ambos varones pelearon al tratar de sacarla de la pelea. En ese momento sonó el disparo. (E.N.P., pág.102).

A preguntas de la fiscalía, señaló que el acusado se encontraba presente en el lugar de los hechos, en la calle, como a 30 pies. (E.N.P., pág. 105). Testificó, además, que no vio quién disparó, y que al irse del lugar con su esposo, le hicieron dos disparos al carro, hecho que a preguntas del fiscal contestó que no había reportado a la policía. (E.N.P., pág. 106).

## IV

En síntesis, ésta fue la prueba que tuvo ante sí el jurado. Luego de la deliberación pertinente, éste encontró culpable al acusado de todos los delitos imputados mediante votación 11 a 1. La defensa alega ante este foro apelativo que el jurado no evaluó correctamente la prueba al encontrar culpable de asesinato en primer grado al acusado, cuando la prueba desfilada fue la de un homicidio voluntario. Entendemos que este error no fue cometido.

El Código Penal de Puerto Rico define el delito de asesinato como dar muerte a un ser humano con malicia premeditada. 33 L.P.R.A. sec. 4001. El asesinato en primer grado, por su parte, es todo asesinato perpetrado por medio de veneno, acecho o tortura, y toda clase de muerte alevosa, deliberada y premeditada, o cometida al perpetrarse o intentarse algún incendio de morada, violación, sodomía, robo, escalamiento, secuestro, estragos, mutilación o fuga. 33 L.P.R.A. sec. 4002.

Se ha resuelto que el concepto de malicia premeditada, elemento mental requerido en el delito genérico de asesinato, *"implica la ausencia de justa causa al ocasionar la muerte, y la existencia de la intención de ocasionar la muerte de un semejante ...: Por ello, la malicia premeditada debe ser determinada a base de los hechos, actos y circunstancias que rodean la muerte, la capacidad mental, motivación y conducta del acusado".* Pueblo v. Rivera Alicea, 125 D.P.R. 37, 45 (1989).

El asesinato en primer grado se comete con malicia premeditada y deliberada. *Pueblo v. Torres Montañez*, 106 D.P.R. 125 (1977). Se ha afirmado por el Tribunal Supremo que la deliberación es la *"resolución... de matar, después de darle alguna consideración; pero cualquier período de tiempo, por corto que sea, es suficiente para que pueda tener lugar la deliberación. Ese lapso, sostienen las autoridades, puede ser tan rápido como el pensamiento... La malicia premeditada y aun la deliberación pueden concebirse en el momento mismo de la realización del ataque".* Pueblo v. Torres Montañez, id., a la pág. 129. Véase también, *Pueblo v. Merced Jiménez,* 100 D.P.R. 270 (1971); *Pueblo v. Ramos Padilla*, 88 D.P.R. 384 (1963).

La deliberación es un acto subjetivo del acusado; no puede probarse con evidencia directa y se precisa, por lo tanto, recurrir a los hechos del caso para determinar si de ellos puede inferirse racionalmente dicha deliberación. *Pueblo v. López Rodríguez*, 101 D.P.R. 897 (1974). Los elementos de premeditación y deliberación pueden deducirse de las circunstancias y relación de las partes, así como de los actos y conducta del acusado. *Pueblo v. López Rodríguez, supra; Pueblo v. Román*, 70 D.P.R. 50 (1949).

El delito de homicidio, en cambio, lo comete toda persona que matare a otra en ocasión de súbita pendencia o arrebato de cólera. 33 L.P.R.A. sec. 4004. Resumiendo en términos generales la jurisprudencia interpretativa de la citada disposición legal, la Lcda. Dora Nevárez Muñíz -en su libro *Código Penal Revisado y Comentado*, Hato Rey: Instituto para el Desarrollo del Derecho, 1997, pág. 128-, nos comenta que:

*"Los elementos del delito son: dar muerte a un ser humano, a consecuencia de una pendencia súbita o de un arrebato de cólera, causado por una provocación adecuada de parte de la víctima."* Pueblo v. Sullman, 103 D.P.R. 429 (1975). Se trata de un acto intencional e ilegal que causa una muerte, pero por existir circunstancias atenuantes en la calificación del delito y la pena varían para beneficio del acusado. La circunstancia atenuante

consiste de que el acto del acusado fue una reacción irreflexiva, pasional, súbita e inmediata, provocada por la víctima u otra persona actuando con ésta. *Pueblo v. Castro Carcía*, 110 D.P.R. 644, 647 (sentencia) (Rigau, disidente).

El homicidio presupone una persona ordinaria que por la cólera, pendencia, o emoción violenta y súbita, causada por una provocación adecuada, pierde el equilibrio y dominio de sí misma. Se excluye, por tanto, al ebrio, al adicto y al loco. *Pueblo v. Belmonte Colón*,106 D.P.R. 82 (1977).

En la modalidad del homicidio por arrebato de cólera, se requiere una provocación capaz de lograr una reacción violenta, intencional, pero no calculada, ni preconcebida en el hombre prudente y razonable. En cambio, en la modalidad de súbita pendencia, al remitir a su origen histórico de pelea súbita, no reflexiva, ni premeditada, no necesariamente requiere una provocación previa. Basta demostrar la existencia de una pelea súbita, a la cual se entra sin la intención previa de matar o causar grave daño corporal. Véase LAFAVE & SCOTT, 574; PERKINS & BOYCE, 88-91; *Pueblo v. Gelpí*, 63 D.P.R. 517 (1944); *Pueblo v. González Ruiz*, 90 D.P.R. 580 (1964); *Pueblo v. González Colón*, 110 D.P.R. 812.

La agresión que causa la muerte, debe estar dirigida contra la persona que provoca el arrebato de cólera o contra quien participa en la súbita pendencia. *Pueblo v. López Rodríguez*, 100 D.P.R. 897 (1974); *Pueblo v. Cruz Correa*, 121 D.P.R. 270 (1988)." (Enfasis suplido).

Por último, cabe señalar que "*la provocación susceptible de reducir el delito de asesinato a homicidio voluntario, tiene que ser aquélla de tal naturaleza que haga perder el dominio de sí mismo a un hombre de temperamento corriente obligándolo a actuar por el impulso producido por notable provocación, sin la debida reflexión y sin formar un determinado propósito*". *Pueblo v. González Pagán*, 120 D.P.R. 684, 690 (1988).

La prueba desfilada en el recurso de autos, según fuera evaluada y creída por los juzgadores de los hechos, fue satisfactoria y suficiente en derecho para establecer la comisión del delito de asesinato en primer grado y la culpabilidad del acusado-apelante más allá de duda razonable.

La prueba de cargo demostró que el acusado-apelante le privó la vida al señor Víctor Manuel Rosario Mercado, mediante el disparo de un arma de fuego. El disparo que provocó la muerte se hizo sin que mediara provocación de clase alguna por parte de la víctima, quien meramente observaba una riña o altercado en la que participaban mujeres, algunas de ellas, familiares suyas.

Tal hecho se desprende del testimonio de varios testigos, quienes como vimos, aseguraron que antes, y al momento de recibir el disparo, la víctima se encontraba recostado de su vehículo y con las manos cruzadas observando el altercado. La prueba de cargo también demostró que la víctima y el acusado-apelante no tuvieron ningún encontronazo, altercado o discusión durante el incidente narrado. Sobre este particular, es meritorio señalar que aunque la testigo de defensa, Yadira Vázquez, testificó que la víctima y Rubén Castro pelearon cuando este último trataba de sacarla de la pelea, a preguntas del Fiscal contestó que el acusado-apelante se encontraba en el área, en la calle, como a 30 pies. Nunca ubicó al acusado-apelante participando en la pelea.

De la prueba surgió, además, que el acusado-apelante se le acercó por detrás al occiso, le disparó con un revólver aniquelado con cabo color marrón a menos de dos pies de distancia, estando este último desprevenido observando un altercado, y luego salió corriendo para abordar un vehículo que le aguardaba encendido y con la puerta abierta. Aun cuando trataron de detenerlos, los ocupantes del vehículo se marcharon aceleradamente del lugar.

Tal actuación excluye la comisión de un homicidio, ya que estuvieron ausentes los elementos de arrebato de cólera o súbita pendencia. De los hechos sí se deduce racionalmente que el acusado-apelante deliberó y premeditó su curso de acción, constituyendo tal conducta, en términos de derecho, un asesinato en primer

grado.

Al evaluar si se probó la culpabilidad del acusado más allá de duda razonable, los tribunales apelativos concederán gran deferencia al juzgador de instancia. *Pueblo v. Rodríguez Román*, 128 D.P.R. 121 (1991). Es norma reiterada que los jueces de instancia y los jurados son quienes están en mejor posición de aquilatar la prueba. *Pueblo v. Falcón Negrón*, 126 D.P.R. 75 (1990); *Pueblo v. Miranda Ortiz*, 117 D.P.R. 188 (1986). La apreciación hecha por éstos, merece gran respeto y deferencia. *Pueblo v. Cruz Granados*, 116 D.P.R. 3 (1984). En ausencia de error manifiesto, prejuicio, parcialidad o pasión, no intervendremos con su apreciación de la prueba. *Pueblo v. Sanabria Pérez*, 113 D.P.R. 694 (1983); *Pueblo v. Lebrón González*, 113 D.P.R. 81 (1982).

El segundo error alegado no fue cometido.

## V

En su primer señalamiento de error, el acusado-apelante alega que el Ministerio Público le violó el debido proceso de ley al ocultarle evidencia exculpatoria desde el inicio del proceso en su contra. En su alegato hace referencia específicamente a las declaraciones juradas que el Ministerio Público le tomó a Jackeline Cuadrado, Damaris Gómez y Yadira Vázquez. Dichas personas nunca se anunciaron como testigos del Ministerio Público, ni en vista preliminar, ni en el juicio.

Valga señalar, primeramente, que nuestro sistema de justicia criminal reconoce el derecho de todo acusado a preparar adecuadamente su defensa, y a obtener, mediante descubrimiento de prueba, la evidencia que pueda favorecerle. Reiteradamente, el Tribunal Supremo ha resuelto que el derecho al descubrimiento de prueba es consustancial con el derecho de todo acusado a defenderse en un proceso criminal en su contra. *Pueblo v. Arocho Soto*, 137 D.P.R. 762 (1994); *Pueblo v. Echevarría Rodríguez I*, 128 D.P.R. 299 (1991). No obstante, el aludido derecho del acusado, no es absoluto. El ámbito del derecho del acusado al descubrimiento de prueba está delimitado, como norma general, por lo dispuesto en las Reglas 94, 95 y 95B de Procedimiento Criminal de Puerto Rico, 34 L.P.R.A. Ap. II; *Pueblo v. Arocho, supra.*

No obstante, tal y como lo dispone la Regla 95 de Procedimiento Criminal, el Ministerio Público tiene el deber ineludible de revelar toda aquella evidencia exculpatoria del acusado que tenga en su poder. Incluso, si una persona interrogada por un fiscal en la investigación de un caso puede presentar prueba favorable al acusado, el fiscal está en la obligación de suplir su nombre y dirección y la propia prueba exculpatoria, aun sin que el acusado lo solicite. *Pueblo v. Cancel Hernández*, 111 D.P.R. 625 (1981).

*"Evidencia exculpatoria es toda aquélla que resulta favorable al acusado y que posee relevancia en cuanto a los aspectos de culpabilidad y castigo, irrespectivamente de la buena o mala fe exhibida por el Ministerio Fiscal. La 'relevancia' de la evidencia se encuentra condicionada a la impresión derivada por el foro apelativo de que la prueba exculpatoria suprimida, con una razonable probabilidad, habría alterado el veredicto o el castigo impuesto de haber sido presentada al juzgador de los hechos".* *Pueblo v. Ortiz Vega y Rodríguez Galindo*, Opinión de 2 de octubre de 1999, **99 J.T.S. 154.** (Opinión de Conformidad del Juez Asociado Corrada del Río). *Pueblo v. Echevarría, supra*, pág. 333.

Además de la prueba exculpatoria, se ha reconocido, bajo ciertas circunstancias, el derecho de un imputado de obtener las declaraciones juradas de los testigos de cargo. Uno de estos casos, es cuando los testigos se sientan a declarar, ya sea en una vista adversativa de determinación de causa probable para arresto, en la vista preliminar o el juicio en su fondo. En estos casos, obtener copia de las declaraciones juradas salvaguarda el derecho del acusado de contrainterrogar a los testigos en su contra. Regla 95 de Procedimiento Criminal, 34 L. P.R.A, Ap. IV, R. 95. Este derecho se activa, una vez ha concluido el examen directo del testigo. *Pueblo v. Ribas*, 86 D.P.R. 386 (1961).

En *Pueblo v. Ortiz Vega y Rodríguez Galindo, supra*, el Tribunal Supremo determinó que era indispensable

la presentación en vista preliminar de cierta prueba en manos del Ministerio Público para que la defensa tuviera la oportunidad de contrainterrogar adecuadamente al testigo de cargo. Sin embargo, el Tribunal limitó ese derecho expresando:

*"No estamos reconociendo un derecho a una "expedición de pesca" en los archivos de la fiscalía. En esta temprana etapa del proceso criminal, el imputado sólo tiene derecho a demostrar que es improbable que se haya cometido el delito imputado o que él sea el autor de éste. Por ende, además de las declaraciones juradas de los testigos usados por la fiscalía, sólo puede tener acceso a aquella otra prueba en manos del Ministerio Público que razonablemente tendería a demostrar que el testimonio en contra del imputado, no es confiable, o no goza de una razonable garantía de veracidad. No se trata, por ejemplo, de prueba que tenga fiscalía sobre simples contradicciones de los testigos de cargo, sino de aquella prueba de calidad suficiente como para derrotar la estimación de causa probable para acusar". Id.,* a la pág. 159.

Otra instancia en la que se ha reconocido acceso a dichas declaraciones juradas, es si los testigos han sido renunciados por el fiscal por constituir prueba acumulativa. *Pueblo v. Delgado López,* 86 D.P.R. 558 (1962). Esto último presupone que a la terminación de la prueba por el Ministerio Fiscal, se renuncian determinados testigos cuyos nombres aparecen al dorso de la acusación, por ser prueba de carácter acumulativo a la ya desfilada, y se ponen a la disposición de la defensa para que los utilice o no, conforme a la conveniencia del acusado, evitando así que surja la presunción de que de haber declarado, su testimonio hubiese sido adverso al pueblo. *Pueblo v. Quiñones,* 99 D.P.R. 1 (1970).

## VI

En el caso ante nos, el juicio en su fondo fue señalado para comenzar el 14 de septiembre de 1999. Anterior a ello, el 10 de septiembre de 1999, la defensa presentó una Moción al Amparo de la Regla 95 de Procedimiento Criminal. El 27 de septiembre, el caso fue llamado y la defensa alegó que la fiscalía no le había provisto lo solicitado en la referida moción. El tribunal procedió en ese momento a discutir inciso por inciso lo alegado en la moción al amparo de la Regla 95. En el aspecto que nos concierne, el tribunal pidió que la fiscalía entregara a la defensa una lista conteniendo los nombres y direcciones de todas las personas a quienes el Ministerio Público y la Policía interrogaron en relación con los hechos imputados al acusado. Pidió, además, que se entregara a la defensa cualquier evidencia que tuviera y que pudiera favorecer al acusado en estos casos.

De los autos originales del caso, surge que en la vista de juicio en su fondo celebrada el 7 de diciembre de 1999, la defensa solicitó la desestimación de las acusaciones. Argumentó que en Vista Preliminar no se pasó prueba alguna de que al occiso se le ocupara un arma de fuego y que posteriormente advino en conocimiento de que se le tomaron declaraciones juradas a Jackeline Cuadrado Figueroa y Damaris Gómez Vélez. ■ Adujo, además, que el Ministerio Público tenía esa información y no suministró copia de dichos documentos a la defensa.

En dicha vista, el tribunal ordenó al Ministerio Público que le suministrara copia de las declaraciones juradas a la defensa, cosa que el fiscal hizo ese mismo día. La defensa expresó su interés en traer a esas personas como testigos. Incluso, en la vista del 9 de diciembre de 1999, el tribunal, a solicitud de la defensa, ordenó la citación, como testigos, de Damaris Gómez Vélez y Jessica Gómez Vélez. Es importante señalar que Jackeline Cuadrado, Damaris Gómez Vélez y Jessica Gómez Velez no fueron presentadas como testigos por la defensa después que se le facilitaron sus declaraciones juradas.

Al examinar las declaraciones juradas que el acusado-apelante alega debieron entregársele desde la etapa de vista preliminar, notamos que las mismas no pueden conceptuarse como prueba exculpatoria. Veamos.

En la declaración jurada que se le tomó a la joven Jackeline Cuadrado, ésta declaró que llegó al lugar en compañía de Rubén Castro y del acusado-apelante. Describió los pormenores de la pelea y que escuchó dos detonaciones, pero no sabía lo que estaba pasando porque estaba *"achocada y mareada en el piso"*. Luego

contestó lo siguiente a preguntas de la Fiscalía:

*"F: ¿Cuantas detonaciones fueron?*

*T: Yo estaba achocada y mareada y escuché dos detonaciones.*

*F: Le pregunto si ¿Carlos Manuel estuvo envuelto en la pelea?*

*T: No.*

*F: ¿Alguien lo agredió a él, que usted viera?*

*T: No.*

*F: Dígame, ¿quiénes exactamente estuvieron envueltos en la pelea?*

*T: María, la mamá de María, la abuela de María, la tía de María, todas mujeres, las que me dieron a mí, y de mi parte, mis dos amigas Yadira y Damaris.*

*F: ¿Alguien amenazó a Carlos Benítez Suárez?*

*T: No.*

*F: ¿Dónde estaba el tío de María, Víctor Mercado Rosario?*

*T: El estaba parado en la parte de atrás del grupo de su familia, tranquilo, que yo sepa no se metió en la pelea, estaba lejos viendo la pelea."* ▮

Además, la defensa tuvo la oportunidad de presentar a testificar en el juicio a Yadira Vázquez. Como señalamos anteriormente en esta Sentencia, su testimonio tampoco fue uno que tendiera a exculpar al acusado-apelante, ni influyó en el jurado para declarar inocente al aquí acusado-apelante. Al igual que el testimonio de Jackeline Cuadrado, dicho testimonio tiende a corroborar la teoría de la fiscalía y a debilitar la teoría de la defensa en el sentido de que el delito cometido fue un homicidio y no un asesinato en primer grado. Yadira Vázquez, contrario a otros testigos oculares, coloca al acusado-apelante en la calle, a una distancia de 30 pies. Además no lo ubicó participando de la pelea, lo que excluye un arrebato de cólera o súbita pendencia provocada por la víctima. Ello se hace más patente cuando la joven Jackeline Cuadrado, al igual que la mayoría de los testigos de cargo, ubica a la víctima viendo la pelea, tranquilo.

Queremos señalar, además, que a la defensa se le brindó en el juicio la declaración jurada de Damaris Gómez, y aunque se le citó para que fuera testigo, la defensa no la sentó a declarar.

En conclusión, no siendo de carácter exculpatorio las declaraciones juradas antes mencionadas, no erró el Tribunal de Primera Instancia al no desestimar las acusaciones. Cualquier situación que pudiera haber ocurrido entre la defensa y el Ministerio Público respecto a la entrega de dichas declaraciones juradas, cosa que eventualmente se hizo durante la pendencia del juicio, fue inconsecuente a la causa del acusado-apelante.

## VII

Por todo lo expuesto, evaluados en reconsideración los méritos del recurso, se confirma la sentencia dictada, el 15 de marzo de 2000, por el Tribunal de Primera Instancia, Sala Superior de Caguas, por no haberse cometido los dos errores señalados en este recurso.

Lo acordó y ordena el Tribunal, y lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General

## ESCOLIOS 2001 DTA 119

**1.** Artículos 82 y 83 del Código Penal (33 L.P.R.A. secs. 4001 y 4002).

**2.** Artículos 26, 27, 82 y 83 del Código Penal (33 L.P.R.A. secs. 3121, 3122, 4001 y 4002).

**3.** La copia presentada ante nos, no contiene el ponche en la Secretaría del Tribunal de Primera Instancia. Tampoco hay copia del recurso en los autos originales.

**4.** El apelante pudo haber evitado a tiempo que desestimáramos el recurso si hubiera certificado la notificación al Tribunal de Primera Instancia del escrito de apelación, como lo ordena la Regla 194 de Procedimiento Criminal y la Regla 24 (B)del Reglamento del Tribunal de Circuito de Apelaciones.

**5.** Se refiere al área donde están los buzones del correo de toda la comunidad, según se estila en comunidades rurales.

**6.** La testigo, en el contrainterrogatorio de la defensa, dijo que no vio cuando el acusado llegó al lugar. (E.N.P., pág. 37).

**7.** Surge de la Exposición Narrativa de la Prueba que al momento de testificar ese detalle, la testigo señaló la parte derecha y trasera del cuello. (E.N.P., pág. 29).

**8.** De acuerdo al testimonio de la joven María Alexandra Molina, estas jóvenes eran de nombre Lilliam, Yadira, Damaris y Jessica. (E.N.P., pág. 6).

**9.** En la vista en su fondo del 7 de diciembre de 1999, la defensa no mencionó la declaración jurada de Yadira Vázquez.

**10.** Declaración jurada tomada a Jackeline Cuadrado Figueroa el 30 de marzo de 1999. Identificación I - Defensa, páginas 3 y 4.