# 2006 DTA 67

**TRIBUNAL DE APELACIONES
REGIÓN JUDICIAL DE HUMACAO
PANEL XI**

EL PUEBLO DE PUERTO RICO
Apelado

v.

ROBERT ANEL DÍAZ MORALES
Apelante

Núm. KLAN-04-00370

San Juan, Puerto Rico, a 7 de abril de 2006

Panel integrado por su Presidente, el Juez Brau Ramírez,
el Juez Colón Birriel y la Juez Hernández Torres

Brau Ramírez, Juez Ponente

RECEIVED AUG 22 2006 SERIALS DEPARTMENT HARVARD LAW SCHOOL LIBRARY

HARV. Dep.
KGV
74
.A21995
v. 12
pn. 1

## TEXTO COMPLETO DE LA SENTENCIA

### I

Con relación a hechos ocurridos en Humacao en la madrugada del 23 de octubre de 2001, el apelante Robert Anel Díaz Morales fue acusado ante el Tribunal de Primera Instancia, Sala Superior de Humacao, por los delitos de asesinato en primer grado, 33 L.P.R.A. sec. 4002, escalamiento agravado, 33 L.P.R.A. sec. 4277, robo, 33 L.P.R.A. sec. 4279, y restricción a la libertad agravada, 33 L.P.R.A. sec. 4172.

Al apelante se le imputó que, actuando con otras personas, escaló la residencia de la Sra. Kenia Rosario Viera. El apelante y los otros asaltantes procedieron a golpear a la Sra. Rosario y a esposarla. Luego de eso, la agredieron sexualmente. Los asaltantes cortaron a la Sra. Rosario, la rociaron con material flamable y la prendieron en llamas. Luego abandonaron la residencia, llevándose varios objetos pertenecientes a la víctima. La Sra. Rosario falleció posteriormente a consecuencia de las lesiones recibidas.

Luego de otros trámites, el Tribunal de Primera Instancia celebró un juicio por jurado. El Ministerio Público presentó un gran número de testigos, documentos y piezas de evidencia para establecer su caso.

La prueba principal contra el apelante consistió en el testimonio de uno de los coautores del delito, quien declaró que el apelante había participado en el crimen. Este testimonio fue corroborado por el hecho de que, al momento de ser intervenido por la Policía, el apelante tenía en su poder un teléfono celular que pertenecía a la víctima y había sido hurtado de su residencia la noche de los hechos.

El apelante intentó establecer que él le había comprado dicho teléfono a otro de los coautores luego de los hechos. El jurado confirió crédito a la prueba del Ministerio Público y declaró culpable al apelante de los delitos mencionados. ■

El 12 de marzo de 2004, el Tribunal de Primera Instancia emitió la sentencia apelada e impuso al apelante condenas concurrentes que ascendieron a 99 años de prisión.

Confirmamos.

## II

El primer testigo presentado por el Ministerio Público lo fue el agente Antero García Berríos, supervisor de Servicios Técnicos de la Policía de Puerto Rico y técnico de fotografías y levantamiento de huellas.

El agente García declaró que el día de los hechos había acudido al Hospital Ryder de Humacao donde estaba la víctima. Le tomó fotografías.

Luego fue a la residencia de la víctima en el Sector la Asturiana de Humacao, con la agente Limaris Cruz. Tomó fotografías del interior de la casa.

La casa estaba totalmente desorganizada. La ducha del baño estaba abierta. Se veían pisadas de sangre por todos los lugares por donde había caminado la víctima.

La agente Cruz y el Fiscal que acudió a la escena del crimen recogían la evidencia. Además de tomar fotografías, él levantó huellas dactilares.

En el C.I.C. tomó fotografías de unas esposas. El 2 de mayo de 2002, tomó fotografías de un teléfono celular. Luego de la muerte de la víctima, el 31 de diciembre de 2002, fue al Hospital Universitario de Carolina y tomó fotografías del cadáver. El 27 de agosto de 2002, fue con los fiscales Arill y Rubio y la agente Cruz y tomó fotografías de un terraplén.

Levantó 16 parches de huellas en diferentes lugares de la residencia. Tomo muestras en los gabinetes de la cocina, la nevera, puertas. No se tomaron huellas de todos los gabinetes, ni de los vasos, ni de todas las paredes. Las huellas tenían valor identificativo. Se compararon con las de los imputados. El resultado fue negativo. ■

El testigo Félix Viera Díaz declaró que él era tío de la víctima y que había identificado su cadáver el 1ro de enero de 2002 en el Instituto de Ciencias Forenses.

La patóloga Rosa Pérez Castillo, quien realizó la autopsia de la víctima, declaró sobre sus hallazgos.

El cuerpo de la víctima tenía quemaduras extensas infectadas, necróticas, fétidas del tejido subcutáneo; tenía áreas con exposición del músculo, que no tenía piel; áreas con material purulento.

La testigo explicó que la quemadura rompe la barrera del cuerpo cuya protección es la piel y se hace vulnerable al proceso de bacterias. Hay cambios fisiológicos que ocurren en el cuerpo cuando ocurren quemaduras: desbalance electrolítico, se rompen las proteínas, hay disminución del flujo sanguíneo, se va muriendo la piel, ocurren daños a múltiples órganos. Hay personas que pueden morir en tres días por las quemaduras, otras mueren tardíamente, como la víctima en este caso. La muerte es tardía, pero provocada por las quemaduras extensas que sufrió.

La testigo estimó que la extensión de las quemaduras fluctuaba entre el 32 al 35%, que es bastante. Para llegar al total de la afectación corporal, se van midiendo las áreas afectadas y se va sumando. Estaban afectadas por quemaduras las regiones abdominal, vaginal, vulvar, anal, perianal, la parte interior de los muslos, el aspecto posterior, y el aspecto anterior.

No es normal que haya quemaduras dentro de los glúteos ni en la región anal, ya que normalmente esas áreas no deben quemarse, a no ser que exista la intención de quemar dichas áreas, o que se haya administrado una sustancia directa a esa área.

Cuando se evalúa el ano, se toma como un reloj; a las 5 tenía discontinuidad. Tenía afectación del área y

hubo desgarre, rompimiento del ano que puede ser compatible con la introducción de un objeto o del órgano viril de un hombre.

Tenía las manos y las piernas quemadas. La mano izquierda presentaba quemaduras con área de necrosis, tejido muerto. La parte interna y baja de los glúteos estaba afectada. Las más severas, sin cicatrizar, era el área de los glúteos y área interna. Tenía quemaduras en los brazos y antebrazos que dejan cicatriz. Los glúteos no habían cicatrizado.

La víctima tenía quemaduras profundas de segundo y tercer grado. La parte más afectada era el ano. Estaba afectada la región perianal, la parte interna, anterior y posterior y parte interna de los muslos, la mano izquierda y la vulva estaba enrojecida. Eso es compatible con que se roció gasolina.

Se presentaron fotografías del cadáver.

La testigo tuvo acceso al expediente médico de la víctima. Ella estuvo hospitalizada convaleciendo alrededor de dos meses y una semana antes de morir. La causa de la muerte fueron quemaduras y sepsis como complicación tardía.

La magnitud de las quemaduras que tiene un paciente como la víctima producen mucho dolor porque estaban localizadas en áreas fisiológicas y provoca dolor al orinar, evacuar y moverse. Además, el tratamiento produce mucho dolor aunque le den medicamentos.

Hipólita Castro declaró que era vecina de la víctima. El día de los hechos, como a las 4:30 a 5:00 a.m., estaba durmiendo cuando sintió que la víctima la llamaba y le decía "*Pola ayúdame que me matan.*"

Cuando abrió la puerta, la víctima estaba completamente desnuda, mojada, quemada, cortada por las nalgas y traía las manos esposadas. Llamó a César y a Magda, quienes eran como padres para la víctima, para que la llevaran al Hospital.

El sargento de la Policía Juan Colón Burgos declaró que el día de los hechos se personó al Hospital Ryder a investigar una querella relacionada a una persona que estaba allí herida. Fue conducido a la sala donde estaba la víctima. Llamó a la agente Johana Hernández para que la entrevistara. Tras la entrevista, la agente Hernández le dijo que la joven le había indicado que eran tres personas las que participaron en los hechos. Luego, él se dirigió a la residencia de la víctima a custodiar la escena. A eso de las 9:00 a.m. llegaron la agente Limaris Cruz, quien se hizo cargo de la investigación, el fiscal Navas y el agente Antero Berríos.

La enfermera Mildred Rosa Rivera declaró que el día de los hechos estaba en su trabajo en el Hospital Ryder cuando llegó la víctima en estado crítico. Le dijo que la habían asaltado. El guardia de seguridad le quitó las esposas que le fueron entregadas a una enfermera.

La víctima estaba toda despellejada; tenía la piel en carne viva. Notó que olía a gasolina. La paciente tenía uñas postizas y las tenía derretidas. Los dedos los tenía hinchados; las manos hinchadas, despellejadas. También tenía laceraciones en ambas manos por las esposas. Vio que tenía quemaduras en las partes genitales. Las manos estaban quemadas y olían a gasolina.

Recuerda el caso porque en lo que lleva de enfermera fue el primero así de impresionante.

El Dr. Eraclio Fernánez declaró que había atendido a la víctima.

Estaba toda quemada. Tenía quemaduras en las manos, los glúteos, las extremidades, en los genitales y en

el ano. Tenía laceraciones en las piernas, hechas con una cuchilla. Aunque estaba consciente, nunca habló. Como tenía quemaduras de tercer grado, la refirió al Centro Médico. Advirtió que la víctima tenía cierto olor a gasolina.

Manuel Díaz Espino declaró que era compañero de trabajo de la víctima y que para la fecha de los hechos, él estaba empezando una relación sentimental con ella. La víctima estudiaba de noche un bachillerato en enfermería.

El 22 de octubre de 2001, la recogió entre las 10:00 y las 10:30 p.m. en Plaza Centro porque ella tenía el carro dañado. La llevó a la casa de ella en el Barrio Tejas de Humacao. Estuvo allí como una hora a hora y media. Esa noche, cuando él se marchó la casa estaba recogida. No había allí un pote de Dr. Mechanic. Al llegar a su casa, llamó a la víctima a eso de las 12:36 a.m. para decirle que había llegado bien. La conversación fue breve porque la notó dormida.

A eso de las 7:00 a.m. del otro día lo llamaron para decirle lo sucedido.

La víctima tenía un celular azul oscuro, con el número 612-1195.

El último día que la vio fue el 27 de diciembre de 2001 cuando fue a intensivo del Hospital de Carolina a llevarle un regalo de Navidad. Ella estaba prácticamente inconsciente. No podía hablar. El le habló, pero ella no le contestó. Sabía que ella lo escuchaba porque le hizo gestos. Lo próximo que supo fue que había fallecido.

María Herrera López declaró que conocía a la víctima desde hacía 4 años porque estuvo casada con el sobrino de su esposo. A pesar de que se divorciaron, su esposo y ella continuaron su amistad con la víctima, a quien veía todos los días.

Conoció a Ismael Román García en casa de la víctima. Ellos tuvieron una relación sentimental que duró poco. Para el día de los hechos, la relación había terminado.

Cuando la víctima llegaba de la universidad, Ismael iba todos los días a visitarla. La víctima le dijo que necesitaba tiempo para estudiar. Le dijo que no volviera. Ismael siguió llamándola y la perseguía. Por la noche, cuando la víctima regresaba a su casa, se lo encontraba por el camino.

En su presencia, la víctima llamó a la mamá de Román García y le pidió que le dijera a su hijo que la dejara sola.

El día de los hechos, la llamaron a eso de las 4:15 a.m. para decirle que a la víctima le había pasado algo. Ella y su esposo la llevaron al Hospital.

La víctima estuvo como una semana en Centro Médico y después la cambiaron para Carolina. Ella la visitaba todos los días. Para el 30 de diciembre de 2001, la víctima ya no la reconocía.

El Dr. Pedro Díaz Bretaña declaró que era obstetra y ginecólogo. Intervino con la víctima en la Sala de Emergencia del Hospital Ryder. Lo llamaron porque se trataba de un caso de abuso sexual.

Anotó en el expediente lo que la víctima le refirió sobre cómo había sucedido la agresión: *"Paciente refiere que estaba durmiendo, recibe un golpe. Le dicen que es un asalto. La amarran. Le amarran las manos. Le dice que cojan el dinero. Siento que me introduce algo por el ano. Me lo metieron por detrás, boca abajo, por el ano. Luego me echaron gasolina y me prendieron fuego."*

En su examen encontró que tenía quemaduras en los glúteos y en las manos, heridas cortantes en los muslos y un trauma en el ojo izquierdo. Tenía olor fuerte a gasolina en el área vaginal. Tenía laceraciones en el ano compatibles con la penetración de un objeto o pene.

El agente de la Policía Oscar Cortés Santiago declaró que el 31 de octubre estaba haciendo rondas a pie en el pueblo de Gurabo. Ese día, se le acercó un comerciante y le preguntó si había leído en el periódico los sucesos de Humacao, refiriéndose a los hechos del caso. El comerciante le dijo que tenía información sobre quiénes eran los posibles sospechosos. Le contó que Tony Caneca [José Luis Delgado], un adicto, le había dicho que había sido contratado por Ismael Román y otros dos para cometer los actos. Le dijo que Román era calvo, manco, guardia penal y que tenía un Mitsubishi rojo.

Con esta información procedió a llamar al C.I.C. de Humacao para comunicarse con el agente a cargo de la investigación. Como la agente Cruz no estaba, al día siguiente la llamó y le comunicó la información. Le dijo que sabía quién era Caneca.

José Luis Delgado Vélez, alias Tony Caneca, declaró que tenía 26 años y residía en el Albergue de Testigos.

Estudió sólo hasta el tercer grado en educación especial. Para la fecha de los hechos era adicto a heroína. Ayudaba a la gente a hacer trabajos y le daban dinero que usaba para comprar droga. Para esa época, consumía de dos a tres bolsas diarias.

Al momento de prestar su declaración, ya no era adicto. Dejó de serlo cuando intervinieron con él y le ocuparon una jeringuilla. Fue preso por eso. Dejó de usar sustancias controladas para esa época. No ha vuelto a usarlas.

Para el día de los hechos, estaba en la plaza de recreo de Gurabo. Había una muchacha que vendía papas asadas a quien él le decía la "*Gordi*". El la ayudaba a montar y desmontar las carpas. Ella le daba $2 o $3. El frecuentaba ese lugar.

Para esa época, él vivía en una casa vacía en Gurabo donde la mayoría de los tecatos del pueblo iban a curarse. Vivía debajo de la casa en unos cartones sobre la tierra. Allí también él usaba drogas.

Un día, la Gordi le dijo que había un señor que lo estaba buscando para un trabajo de unos bloques, para montar unos bloques. En ese momento apareció la persona. El se fue con el señor en el carro de éste. Esa persona iba allí al carrito de papas a comer. Lo conocía con el apodo de Manco. Era una persona bajita y tenía una mano que metía para adentro. Siempre andaba con un "*jacket*" negro con letras amarillas y llevaba una pistola a la cintura y unas esposas en la parte de atrás. Pensaba que era guardia, que trabajaba en las cárceles. Tenía un Technica rojo.

La persona y él salieron del pueblo por la autopista. A mitad del camino, el individuo le dijo que le iba a mandar unas flores a una muchacha. Como el individuo no podía escribir, el dijo que le escribiera en un papel, y él lo escribió: "*Si no eres mía, no eres de nadie.*"

Llegaron a una plaza en Humacao y el individuo le dijo que pusiera el papel en el cristal de una guagua. Cuando él viraba de poner el papel, el individuo se dio cuenta de que venía una muchacha y le dijo a él "*echa el sillón para atrás*", como para que él se escondiera. El se bajó un poco.

El individuo se bajó del carro y se fue a hablar un rato con la muchacha. Cuando regresó le dijo que fuera corriendo y quitara el papel. El fue y quitó el papel y se lo dio al individuo que lo rompió y lo botó por la

ventana. Ahora sabe que la muchacha se llamaba Kenia.

El individuo arrancó y cayó en la autopista de nuevo. Se metieron por una casa blanca donde hay un palo de mangó y un terraplén como si hubieran pasado una máquina. El individuo le dijo que él tenía acceso a esa casa y que se metiera allí a robar, a violar, a cortar y quemar. Le dijo que lo que encontrara allí era para el testigo. Le enseñó un control para abrir un portón. Le dijo que la casa tenía dos cuartos, dos portones, que uno abría con control y otro empujándolo. Se marcharon del lugar.

Cuando llegaron a Gurabo, él le pidió al individuo $10. El individuo le dijo que consiguiera unos tecatos para ir para allá, para la casa. El no estaba interesado porque era adicto; lo que quería era que el Manco le diera el dinero. El individuo le dio $10. El tipo arrancó y se fue y le dijo que volvía.

El se fue para el punto, compró una bolsa de droga y se la metió. Se quedó dormido.

Cuando se despertó era por la tardecita. Cuando va caminando por la plaza se percata de que estaba llegando el Technica rojo con el Manco, Danny y "*Quenepo*" [el apelante]. El Manco se parquea. El apelante le dijo que él no podía subir al punto en Gurabo a buscar droga y que fuera él. El punto era en el cerro.

Cuando el Manco lo dejó en la plaza donde estaba el carrito de Gordi, él le dijo a la Gordi que el Manco no lo quería para un trabajo de bloques, sino para enseñarle una casa para que se metiera a robar, cortar, quemar y violar. Le dijo esto a la Gordi porque le tenía confianza a ella.

Cuando el Manco llegó a la plaza con Danny y el apelante, él se fue a comprar una bolsa de droga para el apelante. El apelante y él se metieron la bolsa de droga juntos.

Luego de consumir droga, se montó en el carro de Manco. Manco guiaba, Danny iba al lado de él. El apelante y él iban atrás.

Como él había consumido droga con el apelante, se quedó "*ennotao*". Cuando despertó, estaban en el mismo sitio al que él había ido con el Manco, donde estaba el terraplén. Queda más abajo de la casa.

El Manco dice que se iban a meter en la casa. Se metió las manos en el "*jacket*" y sacó tres navajas "*genes*", con mango plástico que tienen un botoncito y una hoja de metal. La dio una a él, otra a Danny y otra al apelante. Los tres se las echaron al bolsillo.

Cuando llegaron al terraplén eran como las 6:00 p.m., cuando cae la tardecita. Manco les dijo que en la casa había prendas y dinero y que lo que encontraran en la casa era para ellos.

Estuvieron un tiempo estacionados en el carro. Cuando Manco dijo "*ahora vamos*", Manco y Danny fueron primero. El apelante y él se quedaron en el carro, esperando a que les avisaran.

Manco y Danny se bajaron. Se metieron en la casa. Luego el apelante y él caminaron hacia el lugar.

Cuando llegaron, ya Manco y Danny habían abierto la casa y habían entrado. Manco les dijo: "*Entren ahora*". La casa tiene una puerta al frente y una al lado. La puerta del lado era la que estaba abierta.

La casa tiene dos portones, uno que abría con la mano y otro con control. Ellos habían abierto el que se abre con la mano.

Cuando entraron estaba la cocina con sillas y mesas. Registraron los gabinetes. El apelante abrió la nevera y

empezó a comer una manzana.

Manco le dio unas pinzas para que cortara el cable del teléfono y lo cortó. Luego Manco le pidió las pinzas y él se las devolvió.

El apelante se comió la manzana y registró las gavetas y los gabinetes de la cocina. Danny y Manco se metieron en un cuarto.

El fue al baño, orinó y se lavó las manos. Cuando salió del baño vio abierta la puerta del cuarto al que habían entrado Manco y Danny. El se metió. Manco estaba pegado a la pared. Danny tenía a la muchacha encima de la cama esposada boca abajo. El apelante estaba en la cocina, porque él no lo vio en el cuarto.

Manco le hizo señas a Danny y éste se le trepó encima a la muchacha y se lo empezó a meter. La haló por las caderas. El se asustó y pensó salir del cuarto. Manco tenía la mano puesta sobre la pistola negra que siempre tenía. No se atrevió a salir del cuarto. No sabía qué hacer.

Danny terminó y se salió de encima de la muchacha. Manco le dijo *"Dale que ahora vas tu."* El se bajó el pantalón y se lo metió. La muchacha estaba de espaldas, encima de la cama. Se vino y se salió de encima de ella. Al terminar se quedó parado en el cuarto. Manco le dijo: *"Vete y registra el otro cuarto a ver qué encuentras."*

El fue al otro cuarto que tenía puertas de closet con espejos. El closet estaba lleno de ropa. Era un cuarto como de una nena. Registró el cuarto, la ropa del closet. No recordaba si en él había ropa de niña y de adulto. Tiró toda la ropa del closet y sacó la del *"hamper"*. Estaba buscando algo que pudiera vender. Cogió un radio, unos CD, una lata de pepsi y unos perfumes que echó en una bolsa. Cuando se iban a ir, Manco le dijo que se los llevara. El no se los quiso llevar, sino que los dejó en la cocina. Sabía que si se los llevaba y la Policía lo veía en el pueblo vendiendo un radio y unos perfumes, lo iban a parar y a preguntarle de dónde se los había robado.

Luego que salió del cuarto, puso las bolsas en la cocina y viró para atrás. En el cuarto estaban Manco y Danny. Danny sacó una navaja y cortó a la muchacha por los muslos; la cortó par de veces. Manco le dijo que él también sacara su *"gen"* y la cortara. Con miedo, la sacó y la cortó una sola vez.

El se salió del cuarto y fue al otro cuarto.

Mientras Danny y él se lo metían a la muchacha, Manco tenía el pene en la mano estimulándose, masturbándose y la otra mano en la pistola. Le daba en las tetas, en las nalgas, le decía que si no era de él no era de nadie. Lo decía en tono bajo.

Cuando estaba en el otro cuarto sintió peste a gasolina. Va para el cuarto de la víctima y allí la peste a gasolina era más fuerte. Vio a Danny encima de ella y vio al Manco hablándole. Manco se metió la mano en el *"jacket"* y sacó un *"lighter"* rojo. El cuarto estaba regado. Habían buscado Danny, el apelante y él.

Danny cogió un montón de prendas que había en un cofrecito del cuarto de la víctima. Había un teléfono negro Nokia en el cuarto de ella y el apelante lo cogió. En ese momento, ella estaba esposada y Danny estaba encima de ella. Manco le dio el *"lighter"* a Danny.

El apelante vio a la víctima acostada y cortada cuando entró a buscar.

Danny la prendió con el *"lighter"*. Prendió como que explotó. Cuando ella cogió fuego, estaba encima de la

cama. Antes de prenderle fuego, Danny le estaba metiendo unos trapos por la vagina. No vio el sitio exacto por donde lo metió. Lo metió por esa área. De repente la prendió con el "*lighter*". Ella comenzó a brincar, dio una vuelta encima de la cama y cayó al piso.

El salió corriendo para la cocina porque no aguantaba más. Danny y el Manco se quedaron un rato mientras el fuego estaba encendido. Manco salió y les dijo: "*Vámonos.*" Salieron hasta el carro. Salieron todos juntos y llegaron hasta el Technica rojo. El Manco guiaba, Danny seguía al lado; el apelante detrás del Manco y él detrás de Danny. El Manco les pidió que le dieran las cuchillas y ellos se las devolvieron.

De la casa, Danny se llevó un buche de prendas, pantallas, cadenas, pulseras. El apelante se llevó el teléfono.

Se fueron en el Technica rojo. Danny decía que se lo metió, que se joda. Manco se burlaba de ella. Decía: "*Si no es mía, no es de nadie.*" Se dirigieron a Gurabo. A él lo dejaron en la plaza del pueblo. Danny y el apelante siguieron con Manco. El cogió para abajo, para los negocios, para buscar dinero y meterse droga.

Después de esto, veía a Manco cuando se paraba donde trabajaba la Gordi. Le tenía miedo porque antes de arrancar el carro de la casa de la víctima, les dijo, por el camino que si decían algo, los iba a matar.

Volvió a ver a la Gordi. Le dijo que Manco no lo quería para unos bloques. Le contó a ella lo que había pasado, que Manco le dijo que quería que se metieran a la casa a robar, cortar y quemar. La segunda ocasión que vio a Gordi ella estaba leyendo el periódico. Ella le preguntó a él que si eso era lo que el Manco había hecho. El le dijo que sí.

Volvió a ver a Manco en el carro de las papas. Cuando lo vio, cruzó la carretera para irse por la otra acera porque le tenía miedo.

Volvió a ver al apelante en un Technica gris en un negocio de Gurabo. El estaba jugando billar. El apelante le dijo que la Policía lo estaba buscando y que si decía algo se iba a "*joder*". El estaba asustado por todo lo que había pasado.

Una noche, él estaba en la casa donde vivía y se metieron unos tipos vestidos de negro y le dieron una pela. Pasó un guardia municipal y los tipos se fueron. Cuando le daban la pela le dijeron que lo iban a matar por "*chota.*" Cuando esto pasó, no sabía que la Policía lo estaba buscando.

Un día estaba leyendo un periódico y de una guagua se bajó un montón de gente. Lo llevaron al cuartel y lo interrogan. Intervino con él la agente Limaris Cruz.

Estaba asustado porque el Manco lo había amenazado y le decía las cosas a medias a la agente.

En el contrainterrogatorio declaró que fue adicto desde antes de los 20 años. Se inyectaba heroína. Durante esos seis años que fue "*tecato*", trató de dejarlo par de veces, pero no tuvo éxito porque no lo cogieron en ningún hogar.

Para el mes de octubre de 2001 se metía a diario par de bolsas. Se le preguntó si en la vista preliminar había declarado que para esa fecha se metía a diario de 6 a 7 bolsas. Respondió que par de bolsas. Se le preguntó que cuánto eran "*par de bolsas*". Respondió que de 3 a 4 bolsas. Se inyectaba la droga. Ya no es "*tecato*".

En la vista preliminar declaró que se metía toda la droga que apareciera. Si aparecían 3 bolsas, se metía 3 bolsas. Si aparecía dinero para 2, se metía 2 bolsas. Se la inyectaba en la mano. Se metía droga todos los días.

Se le preguntó si se metía droga a la 1:00 p.m., cuánto tiempo podía estar sin meterse droga; respondió que, depende del efecto que le haga la droga, como una hora a una hora y media. Cuando no se la metía o le pasaba el efecto de la que se había metido, le daba dolor en los huesos, náuseas, diarrea. Cuando le pasaba el efecto, no funcionaba. Por eso tenía que meterse más.

El apelante era "*tecato*" igual que él. Se metía heroína. Se había metido droga con el apelante antes.

Esa noche tuvieron bastante tiempo en el carro esperando a que cayera la noche. Llegaron al lugar de tardecita. No sabe cuánto tiempo esperaron porque no tenía reloj. Esperaron en el carro un ratito.

Ese día el apelante le dijo "*vamos a capear*". El apelante lo mandó a él a buscar la droga. El apelante le dio los chavos y él subió a buscarla. El apelante no podía ir a buscarla por un problema que tenía.

Ese día fue a la casa porque Manco le había dicho que había dinero y prendas. Fue allí a robar. Dejó lo que se iba a llevar por miedo a que si la Policía lo veía vendiendo, sabrían que era robado y se podía buscar un problema.

Todo lo que él cogía lo vendía para comprar droga.

No recuerda el día que habló con la agente Limaris Cruz por primera vez. Le dio varias versiones. Le dijo que Danny y el Prieto se montaron con el Manco. No mencionó al apelante. Explicó que Danny y el Prieto son la misma persona y que a Danny le dicen el Flaco.

Estimaba mucho al apelante y no se atrevió a decir que andaba a con él ese día, cuando Limaris le preguntó quiénes estaban con él. Lo sacaba de los hechos. Siempre que Limaris lo interrogaba, sacaba al apelante hasta que dijo la verdad completa.

El y Danny no eran amigos. No pedía dinero con él. Lo veía en la casa en que se metía droga. Se metió droga con Danny.

Limaris lo entrevistó par de veces. El fiscal Rubio lo entrevistó varias veces. Al fiscal Rubio le habló varias veces de Danny el Flaco y del Prieto. No les habló del apelante.

Danny y el Prieto son la misma persona. Danny es un tecato. El Prieto no existe; él se lo inventó. Cuando la agente Cruz lo entrevistó él le dijo que vivía en el cerro. La llevó a la casa de Danny. El Prieto era Danny.

A la agente Cruz le dijo que Danny estaba vendiendo prendas en un negocio y que el dueño lo sacó de allí.

Cuando decidió declarar no le prometieron nada. No le dijeron que lo iban a ayudar. Le dijeron que hablara, que siempre hablara con la verdad y eso es lo que está haciendo.

Sodomizó a la víctima. La tajeó. Todo esto lo hizo bajo amenaza de Manco, que estaba parado en la pared y tenía la mano en la pistola. El fue a robar y creía que el Manco estaba tripeando de lo demás.

Antes de ir para allá consumieron droga. Se le preguntó si en el momento en que tuvo relaciones sexuales con la víctima habían pasado 6 horas desde que se metió la droga. Respondió que no sabía. Se le confrontó con que había declarado que no podía estar de una hora a hora y media sin meterse droga porque no era funcional. Se le preguntó que cómo explicaba que estuvo 6 horas desde que se metió droga en un carro esperando y fue funcional. Respondió que estuvo en el carro esperando, llegó por la tardecita y tuvo relaciones sexuales con la víctima.

Fue a la casa cuando el Manco se la enseñó y luego fue con Antero y con Limaris.

Nunca tuvo el celular de la víctima en las manos. Lo vio encima de la coqueta. No estuvo pendiente del celular. Nunca lo tuvo en sus manos. A la agente Cruz le hizo un dibujo del celular.

Se había metido droga con el apelante un par de veces. El apelante lo que hizo fue comerse una manzana, buscar en la cocina y se llevó un celular. Danny y él la sodomizaron y la cortaron. Danny le prendió fuego. Lo que él hizo lo hizo bajo amenaza.

Después de los hechos vio al apelante quien le dijo que la Policía lo estaba buscando. En su declaración jurada no dijo que el apelante lo amenazó ese día.

Conoce a un muchacho de nombre Javier de Celada que le dicen Quenepo. Al apelante también le dicen Quenepo.

A Ismael lo conoce por el Manco. No sabe el nombre. Le dijo a la agente Limaris que el apelante tenía el pelo ricito, era un muchacho chiquito y que vestía bien, con una mellita.

El apelante es Quenepo y es la persona que estaba con él el día de los hechos.

Lo que Danny se llevó de allí lo vendió. Fueron prendas. El no se llevó nada por miedo. Fueron a vender las prendas a una persona que le dicen la Prieta. Danny vendía las prendas para meterse droga con él.

En su declaración jurada, dijo que esa misma noche él le había ofrecido las pantallas a la Prieta y que ella no se las compró. Después, se las ofreció a una muchacha. Vendió las pantallas y se compró una bolsa de heroína. Danny y él se metieron la droga. Eso no ocurrió el día de los hechos.

Declaró que venía a decir la verdad. Allí estuvieron los cuatro y los cuatro van presos.

Estaba en un negocio cuando Danny llegó a vender las prendas. La Prieta le dijo que el negocio no era para estar vendiendo prendas allí.

En el redirecto expresó que no sabía cuántos minutos tiene una hora. La semana tiene cinco días. No sabe cuántos días tiene un mes. No sabe cuánto tiempo llevaba declarando.

La agente Cruz y el fiscal lo entrevistaron y poco a poco fue declarando la verdad porque tenía miedo. Sabía que lo que había pasado estaba mal.

Los fiscales le dijeron para dónde iba cuando terminara de declarar en contra de los acusados. Iba para la cárcel. Está acusado por los hechos igual que los demás.

El Quenepo que estuvo en la casa de la víctima es el apelante. No es otro.

La agente de Delitos Sexuales de Humacao, Limaris Cruz, declaró que el día de los hechos había recibido una llamada del radio operador, quien le indicó que había un caso en el Hospital Ryder. Ella se dirigió al Hospital. Habló allí con el Dr. Fernández y le solicitó que le permitiera entrevistar a la víctima. Luego fue con el fiscal Navas a la escena. Allí estaba el sargento Antero Berríos de Servicios Técnicos.

Al entrar en la cocina observó que los gabinetes tenían las puertas abiertas. En la barra había un envase amarillo que leía Dr. Mechanic que expedía un fuerte olor a gasolina. Lo ocupó para enviarlo al Instituto de Ciencias Forenses. En el mostrador que dividía el comedor de la cocina había un "cover" para guardar ropa que tenía adentro un componente, un video y otras cosas. Había un recibo de compra de un CD que había sido

comprado esa noche.

Había manchas de sangre en el piso desde la entrada. El cuarto de la víctima estaba todo regado. La coqueta tenía las gavetas abiertas y todo estaba afuera en el piso. El aire acondicionado estaba encendido. Las ventanas estaban completamente cerradas. Las sábanas de la cama estaban en el piso, quemadas y con sangre.

La agresión sexual ocurrió en el cuarto de la víctima. Todo se retrató. De ahí se levantó mucha evidencia, de 25 a 30 piezas. Había una sudadera rosa, unos "*panties*" cortados, una servilleta Bounty manchada con sangre que estaba en el sofá reclinable frente a la cama, pelos, un "*lighter*", ropa de cama. Toda la evidencia que se ocupó se llevó al otro día al Instituto de Ciencias Forenses.

Fue al baño. Había una alfombra clara con huellas de pies ensangrentados. La ducha estaba abierta botando agua. Había un tizne negro en la pared y dentro de la bañera había un pedazo de tela quemada que contenía excreta. Era un pedazo de sábana.

Cuando los individuos se fueron, la víctima fue hasta la ducha y con la boca abrió la pluma y pudo apagar el fuego. Pudo pujar el paño que le habían introducido en el ano, que fue ocupado en evidencia.

El 24 de octubre de 2001, entrevistó a la víctima en el Hospital Universitario. La familia se percató de que le habían llevado el celular. Se estudiaron las facturas del celular. El celular fue empleado después de los hechos por primera vez, el 28 de octubre de 2001.

El 9 de noviembre de 2001 se reunió con personal de la Unidad de Robo a Bancos y el C.I.C. e hicieron un plan de trabajo con el propósito de rastrear el celular mediante un equipo especializado.

Fueron al cuartel de Gurabo para recuperar el celular. La División de Robos a Bancos tiene un sistema para rastrear celulares. Para ello se ubicaron en la antena que proveía la señal.

Los agentes de Robos a Bancos iban en un vehículo rastreando el celular y ella iba en otro vehículo. A solicitud de ellos, ella llamó al celular de la víctima. Después de un rato de ella decir "*hello, hello*", le contestó un varón. Mientras le hablara, los agentes seguían la señal. Llegaron a la ATH del Banco Popular de Gurabo. Llegó un jeep con 4 ó 5 jovencitos. Ahí estaba el celular.

Intervinieron con los jóvenes. El celular le fue ocupado al apelante. Eso fue el 9 de noviembre de 2001.

El apelante le dijo que él le había comprado el teléfono a un "*tecato*." El "*tecato*" le había dicho que estaba enfermo y que le diera $5.00 por el celular. El apelante la llevó hasta frente la casa del "*tecato*" esa misma noche. Le dio la descripción de la persona. La descripción era la de Irving Daniel Carrasquillo Oliveras, que le llaman Danny o el Flaco. Días antes, José Luis Delgado la había llevado a la misma casa.

El 1ro de noviembre de 2001, había recibido una llamada de Oscar Cortés del distrito de Gurabo, quien le dijo que un individuo de Gurabo, que era "*tecato*", apodado, Luis Caneca, le había manifestado que otra persona que era guardia penal y manco, lo había contratado para quemar, violar y cortar a una mujer. Ella fue a Gurabo, entrevistó al agente y luego intervino con el individuo.

Entrevistó a José Luis Delgado 8 ó 9 veces. Las entrevistas eran difíciles porque él era una persona que estaba en el vicio. Cada vez que hablaba con él, se enteraba de algo diferente.

Lo tuvo que entrevistar en varias ocasiones porque no le narraba todo de una vez. Todo era de poquito a poquito. En las primeras entrevistas le dijo bien poco. El estaba bien activo en el uso de sustancias controladas.

Era deambulante.

El agente Berríos levantó huellas de diversos lugares. A pesar de que ella era la agente investigadora, no sabe de qué lugares en específico se tomaron las huellas. El resultado de las huellas no dio positivo al apelante.

Tuvo conocimiento de que Delgado era usuario fuerte de drogas. El le dijo que se metía droga cada hora que podía. Si no se metía droga se enfermaba, se ponía a vomitar.

Según su investigación, los hechos tenían que haber ocurrido después de las 12:36 a.m., que fue cuando Díaz Espino llamó a la víctima para decirle que él había llegado bien a su casa. Delgado no le dijo a qué hora llegó al terraplén.

En su declaración jurada, ella mencionó en dos o tres ocasiones al Flaco Danny y al Prieto. Indicó que cuando ella hizo su declaración jurada, no tenía claro quién era el Prieto. Delgado la llevó a la casa del Flaco [Danny] y le dijo que esa era la casa del Prieto.

Según su investigación, Delgado le mencionó que él conocía a dos personas apodadas "*Quenepo*". No entrevistó a los dos "*Quenepos*" porque ya era bien claro quién era un "*Quenepo*" y quién era el otro "*Quenepo*". Ya ella tenía a su "*Quenepo*".

En los hechos participaron el Manco y tres "*tecatos*".

Citó al apelante en tres o cuatro ocasiones. Se le tomaron muestras de sangre, de cabello, huellas, fotografías.

El apelante era universitario para esa fecha. Ella corroboró esa información luego de someter el caso. El apelante le dijo que era estudiante en la Universidad del Turabo. El le dijo que era usuario de marihuana.

Se le preguntó si Delgado y el apelante se fueron a inyectar heroína antes de los hechos. Delgado le dijo que se fueron a meter droga, no le dijo que fuera heroína.

El apelante la llevó a casa de Danny el Flaco, que era la persona que él decía de quién adquirió el celular.

Le preguntó al apelante cuándo había comenzado a utilizar el celular. El le dijo que hacía como tres semanas. Ella le dijo que el celular se empezó a usar el 28 de octubre de 2001. El apelante le dijo que en esa fecha fue que lo compró.

En Gurabo hay otra persona conocida por "*Quenepo*". Estaba segura de que el apelante es el "*Quenepo*" del que habló Delgado. Con ese "*Quenepo*" es que Delgado se había metido droga. El apelante concuerda con los rasgos físicos que le dio Delgado, quien dijo que era bajito, que tenía el pelo ni lacio ni lamo, con mellita, de Celada. Delgado también se refería al apelante como menor. Fue al apelante al que se le ocupó el celular de la víctima.

Ella investigó las llamadas hechas desde el teléfono de la víctima. La primera llamada que salió se hizo el 28 de octubre de 2001. Se hizo desde el número 712-9468, que es un número que está ubicado en el cerro en Gurabo donde vivía Danny. Semanas después, ella estaba corroborando y llamó al celular. Le preguntó a la dama que contestó si conocía al apelante y ella le dijo que sí y le preguntó si quería hablar con él. En ese momento, el apelante vino al teléfono. Era la 1:00 a.m. El apelante cogió el teléfono y le dijo "*es que yo pasé por aquí por casualidad, yo estaba aquí y se puso bien nervioso.*"

Ella confrontó al apelante con esa llamada en una de las visitas que él hizo a Fiscalía. El apelante le dijo que

esa llamada él no la había hecho y que no conocía el número telefónico. El único "*Quenepo*" que le mintió a ella con relación al celular fue el apelante.

Delgado le dijo que al principio no había mencionado al apelante porque era amigo de él y sentía aprecio por él.

Cuando le ocupó el celular, el apelante le dijo que se lo había vendido un "*tecato*". El la llevó a la casa de Danny en el cerro. El apelante le dio una descripción de Danny.

El 10 de diciembre de 2001, ella le mostró al apelante una fotografía de Danny para que le dijera si esa era la persona que le había vendido el celular. El apelante le dijo que esa no era la persona. Le dijo que el de la fotografía no era "*Danny*". Ella le dijo: "*después que me [lo] describiste y me dijiste dónde vivía, ahora me lo niegas*".

Delgado le dijo que el apelante y él se metieron droga antes de los hechos. Para esa fecha, Delgado usaba heroína. El apelante le dijo que para la fecha de los hechos lo que usaba era marihuana, pero después le aceptó que usaba todo tipo de droga. Cuando lo iban a ingresar, le preguntaron qué tipo de droga usaba y él dijo marihuana. En ese récord se escribe lo que la persona dice.

Transcurrieron 10 meses desde la fecha de los hechos, hasta que ingresaron al apelante. No sabe qué droga estaba utilizando cuando lo ingresaron. Para esa época, el apelante estudiaba. No es la primera vez que tiene una persona acusada que es estudiante. No es la primera vez que un estudiante es acusado de hacer uso de sustancias controladas.

No entrevistó ni trató de entrevistar a la otra persona conocida por "*Quenepo*." No hizo gestiones para corroborar si ese "*Quenepo*" se pasaba o no con Danny. Según la versión de Delgado, el "*Quenepo*" que andaba con él no podía subir el cerro porque lo andaban buscando.

Al apelante se le sacó sangre el 4 de enero de 2002. No se hizo gestión alguna para determinar, a base de un examen de su sangre, si era un "*tecato*". No mandó a analizar la sangre para eso.

Corroboró que el apelante era estudiante universitario.

No buscó si el otro "*Quenepo*" tenía récord. Ella no estaba investigando al "*Quenepo*" de nombre Javier. Estaba investigando a un "*Quenepo*" que era "*tecato*", pero ella sabía quién era. Ella ya tenía su "*Quenepo*."

Delgado le daba la información a medias.

Los testigos Angie Hernáiz Rivera, Minellis Hernández y Murphy Rivera, técnicos de control y custodia de evidencia del Instituto de Ciencias Forenses, declararon en cuanto al recibo y custodia de las piezas de evidencia ocupadas.

El químico forense Oscar Rivera Cruz declaró que había realizado el análisis químico de un pedazo de tela parcialmente quemado y del contenido de un envase con etiqueta que leía "*Dr. Mechanic*." El envase tenía gasolina, no así el pedazo de tela.

Carlos Díaz González, supervisor de la División de Control y Custodia de Evidencia del Instituto de Ciencias Forenses, declaró en torno al recibo y custodia de 8 tubos de sangre tomadas a diferentes personas, incluyendo el apelante.

Roberto López Arroyo, serólogo forense, declaró en cuanto a su intervención en la cadena de evidencia relacionada con un pelo y una servilleta con manchas de sangre.

Carmen Tirado Nieves, supervisora de DNA del Laboratorio de Serología del Instituto de Ciencias Forenses, declaró sobre su análisis de una servilleta que dio positivo al semen de Ismael Román García [el Manco]. Además analizó 29 pelos que fueron presentados para análisis comparativo. Los cabellos en los que se pudo detectar material genético eran compatibles con Manuel Díaz Espino. Aunque éste no era sospechoso en el caso, ello significaba que había estado en el hogar de la víctima.

Alberto Arroyo, encargado del depósito de evidencia de Humacao, declaró sobre su recibo del envase de *"Dr. Mechanic."*

Carlos Torres Acevedo, investigador de la Puerto Rico Telephone Company, declaró que había suministrado los récords sobre las llamadas al celular de la víctima.

Dionides Pietri, agente de la Policía de la Unidad de Robos a Bancos, declaró que el 9 de noviembre de 2001 se le solicitó su cooperación para rastrear una unidad de teléfono. Se trasladó al área de Gurabo en un vehículo oficial con el agente Armando Maldonado. Llevaba un radar para este tipo de vigilancia.

Llegaron a Gurabo como a las 6:00 p.m. Se comunicó con la agente Limaris Cruz, quien le explicó la naturaleza del caso y le dijo que una de las personas que había participado tenía la unidad de celular perteneciente a la víctima. Le dieron el número de teléfono y le enseñaron una factura.

El teléfono se estaba usando mayormente en el área de Gurabo. Comenzaron a hacer el rastreo.

El equipo es una pantalla pequeña como de un televisor. Hay unas circunferencias en la pantalla. Tiene una flecha y una escala del 1 al 10. Esa flechita le va a indicar dónde está el teléfono y la barra va a subir y bajar dependiendo de cuán cercano o cuán lejano esté de la unidad de teléfono. Cuando el teléfono se usa, capta la señal y es bastante fácil ubicarlo.

Luego de una hora u hora y media, habían localizado más o menos donde estaba el celular. El se comunicaba con la agente Cruz mediante la radio de la Policía.

El le informó a ella dónde estaba el celular. Le indicaron que ese era el sector Celada de Gurabo.

Cuado entró al Barrio Celada, la señal era cada vez más fuerte hacia un área. Explicó que entrando por la carretera principal hacia la izquierda era que la señal era más fuerte. Le iba dando instrucciones al agente Maldonado por dónde tenía que doblar. Le dijo que viraran a la izquierda. La señal era cada vez más fuerte. Se dio cuenta que la señal venía regresando rápidamente. Le dijo a Maldonado que virara. Cuando venía la señal, vio un vehículo que venía chillando gomas. Era una RAV4 color oscura. Tan pronto volvió a la bocacalle determinó que el teléfono iba en el vehículo. Le notificó al teniente Velásquez por la radio de la Policía.

Más o menos cinco minutos después, el vehículo estaba frente al Banco Popular de Gurabo. Lo sabía porque se lo dijo el teniente Velásquez. Trató se seguir al vehículo, pero no se pudo porque iba a alta velocidad. Cuando llegó con Maldonado al Banco Popular, ya el teniente Velásquez y la agente Cruz habían intervenido con el vehículo.

En el carro iban 5 muchachitos. Los de la RAV se metieron en el parking del Banco Popular y allí fue que se intervino con ellos.

Rey David Rivera, agente del C.I.C. de Humacao, declaró que a finales de agosto se le encargó diligenciar una orden de arresto dirigida contra el apelante.

Fue con el sargento Colón y la agente Limaris Cruz a ubicar la residencia. La agente Cruz le mostró dónde vivía la persona. Por la tarde volvió al mismo sitio con el sargento Colón y otro agente.

Se apostaron cerca de la casa. Varias horas después, vieron salir de la casa a una persona que se parecía al apelante. Entraron a la urbanización y lo vieron en un grupo de jóvenes. Cuando llegan adonde él estaba, se bajaron y se identificaron como Policías. Inmediatamente, el apelante se levantó y salió corriendo. Ellos corrieron detrás de él. Le gritaban que se detuviera y que ellos eran Policías. Después de dos calles, lograron darle alcance y lo detuvieron. Lo pusieron bajo arresto.

Además de los testigos presentados, el Ministerio Público presentó un gran número de documentos, fotografías y otras piezas evidenciarias para establecer su versión de los hechos.

Por su parte, el apelante presentó el testimonio de Ana Celia Quiñones. Dicha testigo declaró que era la dueña de un negocio de cafetería llamado *"Melo´s Bar"* ubicado en la calle principal de Gurabo.

Conoce a José Delgado [Luis Caneca] desde hace 5 o 6 años. El es un usuario de drogas de Gurabo.

El 28 de octubre de 2001, cerca de las 12:00 a.m., estaba en su negocio. Delgado estaba allí. Había varios clientes. Uno de los clientes le dijo que una persona estaba vendiendo prendas. Ella fue sacando a los clientes.

El domingo siguiente volvió a ver a Delgado en su negocio. Este le dijo: *"Prieta, me acaba de soltar la Policía."* Notó que estaba golpeado. Delgado le dijo que la Policía lo había golpeado. Ella le dijo que se evitara problemas.

Lo vio tres o cuatro días después cuando llegó al negocio a venderle unas pantallas Cartier. Ella le dijo que no quería prendas. El salió. Ella lo vio en la acera. Cuando ella miró, vio a dos usuarios de drogas en un escalón a la derecha del negocio. Uno de ellos era alto, flaco, trigueño y el otro era más bajito.

La primera vez que vio al apelante fue en la vista preliminar cuando la agente Limaris Cruz se lo enseñó. La agente le preguntó si conocía a alguno de los que estaban sentados allí. Le dijo que a Román, porque era de Gurabo. La agente le dijo quién era el apelante. Ella también conocía a Delgado.

Conoce a una persona de nombre *"Quenepo"* que es usuario de drogas en Gurabo. Este *"Quenepo"* se pasaba todo el tiempo con Delgado y con Mario, uno alto, prieto. No ha visto a *"Quenepo"* en el tribunal.

No puede decir si Delgado estaba con los dos *"tecatos"* que ella vio afuera de su negocio. No los vio juntos. Pero ellos siempre andaban juntos.

Cuando Delgado fue a venderle las prendas no los vio juntos, pero ella los veía juntos porque iban a curarse al lado del negocio de ella.

Las partes estipularon el testimonio de María Figueroa Vázquez, registradora de la Universidad del Turabo, quien hubiera certificado que el apelante estuvo matriculado en dicha universidad para el semestre de agosto a diciembre de 2001.

Irving Daniel Carrasquillo Oliveras declaró que le dicen Danny y que fue detenido porque se le está acusando por los mismos delitos de asesinato que el apelante.

Para octubre de 2001, residía en Gurabo con su padre, en el cerro.

Antes de su declaración, había visto al apelante una vez. Está casi seguro que fue un domingo. Estaba tratando de vender un celular para curarse. Para esa fecha, él era adicto a drogas. Al momento de declarar, ya no lo era.

El estaba en el pueblo y vio al apelante. No lo conocía. Se pegó a él y empezó a hablarle diciéndole que si no tenía cinco o diez pesitos que le diera por un celular. Para poderlo convencer le dijo que el celular era de su hermana. El hombre entonces le bregó y se lo compró. No sabe si fue en $5 o $10 que lo compró, pero fue por ahí.

Ese celular, él lo había sacado de un robo en el Barrio Tejas de Humacao el 23 de octubre de 2001. De ese robo, vendió unas prendas. Supo de quién eran. Eran de una muchacha que al momento de declarar estaba muerta.

En el contrainterrogatorio, declaró que le vendió el celular al apelante. Está seguro de en cuánto se lo vendió. Se le preguntó si al abogado le dijo que no estaba seguro en cuánto lo vendió. Respondió que se negaba a contestar esa pregunta. Se negaba a contestar porque el fiscal había oído lo que él había dicho. Se le preguntó si a preguntas del abogado había dicho que no estaba seguro en cuánto vendió el celular. Está casi seguro que lo vendió en $5.00 ó $10.00.

Ese celular lo vendió el apelante un domingo, el 28 de octubre.

El celular que vendió estaba activado; pertenecía a la víctima. El celular era negro. Tenía una antenita pequeñita. Era Nokia. No podía decir el color de los botones. Tuvo el celular en su poder por cinco días. El lo utilizó el mismo día en que lo vendió, no lo utilizó esos cinco días porque no lo necesitaba.

Se le preguntó si pasó el trabajo de llevarse un celular y no lo usó en cinco días. Respondió que eso era así. Se le preguntó que para qué se llevó el celular; dijo que para tenerlo cuando lo necesitara.

El celular solamente se lo ofreció al apelante. No se lo ofreció a más nadie. No le hizo falta en esos cinco días. Era usuario de sustancias controladas para esa fecha. Tenía que curarse todos los días. Durante esos cinco días no necesitó el celular para curarse.

Además de los anteriores, el apelante ofreció el testimonio del Dr. Gualberto Herrero Manzano. Este testigo fue examinado en ausencia del jurado bajo las disposiciones de la Regla 9 de las de Evidencia.

Declaró que era médico licenciado. Estudió en la Universidad Autónoma de Santo Domingo. Se graduó en 1982. Comenzó a trabajar para el Departamento de Salud en 1985.

Para agosto de 2002, estaba adscrito a la Penitenciaria Estatal de Río Piedras en el área de admisiones que es el área en donde se reciben los confinados. Se les hacía un examen físico, una evaluación dental y una psicológica con el propósito de determinar si el confinado tiene alguna condición que amerite tratamiento. Es un procedimiento estándar.

Ha trabajado en distintas instituciones carcelarias en el área de admisiones. Diariamente atiende un promedio de diez a doce personas en cada turno.

Examinó al apelante. La fecha de ingreso a la institución fue el 30 de agosto de 2002. No se acuerda de la cara de él. Le hizo historial médico y un examen físico.

17

Según el récord, cuando le preguntó al apelante si usaba droga, éste le dijo que usaba marihuana. Le preguntó si usaba alguna otra sustancia controlada, si usaba alcohol, pastillas.

En el examen físico encontró que la piel no mostraba ningún signo de trauma haciendo uso de agujas. Lo único que encontró fue un tatuaje en el brazo.

Cuando una persona dice que no usa droga intravenosa, se le revisan los brazos, antebrazos, piernas, muslos y cuello que son las partes del cuerpo en que se ven las marcas de uso de drogas porque a veces niegan el uso de sustancias controladas.

A base de su experiencia puede determinar si una persona usa drogas. Se le preguntó si podía determinar si una persona hubiera usado droga en el pasado, diez meses atrás. Respondió que eso dependía de si la persona era un adicto crónico. Si usaba droga todos los días por las venas se van a encontrar cicatrices, huellas producidas por la aguja hipodérmica, en los brazos, antebrazo, cuello. Si es un usuario ocasional, no hay forma de determinarlo. Si lo usa por tiempo prolongado, por ejemplo, más de seis meses, eso va a producir una cicatriz que no se borra.

Al examinar al apelante no encontró ninguna evidencia de que fuera usuario de droga intravenosa al momento en que lo examinó. Tampoco tenía evidencia de que en el pasado hubiera sido usuario de droga intravenosa.

Durante el contrainterrogatorio, declaró que si una persona se inyecta un día en el cuello, otro día en el muslo, otro en la mano y llevaba poco tiempo inyectándose, es imposible encontrar marcas. Esta persona si va al laboratorio y se saca sangre a la semana no va a tener marca.

Ha encontrado que algunas personas se inyectan en el dorso del pie y en el área genital.

Hay usuarios de heroína que la usan de forma intravenosa y otros nasal, no intramuscular que es la que produce un efecto necrótico en la piel.

El usuario nasal ocasional de heroína es lo mismo que si lo usa por vena. En uno crónico, el color de la mucosa cambia a color rojo, que usualmente es rosáceo. Esa es la forma de darse cuenta si un paciente usa droga por la nariz.

La información que tiene en el expediente en relación a qué tipo de droga y desde cuándo la utiliza es la que le da el paciente cuando lo está entrevistando.

En el expediente del apelante dice que usaba marihuana porque eso fue lo que él dijo. Si el paciente le está mintiendo y usa otra sustancia, por ejemplo, por vena, cuando él se da cuenta ordena su ingreso en el detox. Esto es cuando es un paciente activo en el uso de heroína.

Si hace diez meses estaba activo en el uso de heroína y rompe el vicio y llega sin adicción a heroína, si le dice que él está usando marihuana, eso es lo que él anota en el récord. La forma más certera de saber si es usuario de heroína es hacer una prueba. En un usuario de diez meses atrás, la prueba toxicológica no lo va a demostrar.

Al apelante no le hizo prueba de dopaje. Lo que surge del expediente es que usaba marihuana diariamente desde los doce años.

Se le preguntó cuánto tiempo duraba el efecto de la heroína como para que fuera detectada en una prueba toxicológica. Respondió que 48 horas, si mal no recuerda.

El Ministerio Público alegó que el testimonio del Dr. Herrero no era admisible y se prestaba a confundir al

jurado. Lo único que podía declarar era que el apelante era usuario a marihuana porque eso era lo que el apelante le había dicho. No podía decir si diez meses antes el apelante hacía o había hecho uso de heroína. Delgado lo que declaró fue que el día de los hechos habían usado heroína juntos, no que el apelante usara droga a diario.

El apelante argumentó que la prueba del Ministerio Público era que Ismael Román estaba buscando un par de "*tecatos*" para hacer un trabajo y Delgado declaró que el apelante era "*tecato*" igual que él, que la usaba a diario. La prueba de cargo no fue que fuera usuario ocasional.

El Tribunal denegó la admisibilidad de este testimonio.

El apelante recurrió de este dictamen mediante el recurso KLCE-2003-01398.

El 13 de noviembre de 2003, otro de los paneles de este Tribunal denegó el recurso. En la resolución emitida en esa fecha, este Tribunal concluyó:

"*El Tribunal de Primera Instancia actuó correctamente al negarle la admisión al testimonio del Dr. Guerrero. El propio testigo declaró que por su experiencia podía establecer que una persona ha usado drogas intravenosas y nasales, hasta seis (6) meses antes de la realización del examen médico. En este caso, el examen médico del peticionario fue realizado el 30 de agosto de 2002. Los hechos ocurrieron diez (10) meses antes de realizarse dicho examen, por lo que el perito no puede establecer si para esa fecha el peticionario era o no un adicto.*"

El apelante recurrió al Tribunal Supremo, recurso CC-2003-800, que declinó intervenir.

A base de la prueba desfilada, el jurado emitió un veredicto de culpabilidad. El 12 de marzo de 2004, el Tribunal de Primera Instancia impuso al apelante las condenas apeladas.

Insatisfecho, el apelante acudió ante este Tribunal.

## III

En su recurso, el apelante plantea que el Tribunal de Primera Instancia erró al declararlo culpable a base de una prueba insuficiente que no estableció su culpabilidad más allá de duda razonable. Alega que el testimonio del principal testigo de cargo fue altamente contradictorio e indigno de crédito y que la prueba pericial presentada por el Ministerio Público era de carácter exculpatorio. El apelante alega, además, que el Tribunal erró al excluir el testimonio del Dr. Herrera Manzano.

La Sección 11 del Art. II de la Constitución de Puerto Rico, según se conoce, consagra la garantía a todo acusado de un delito de que se le presuma inocente, debiendo establecerse su culpabilidad más allá de duda razonable. *Pueblo v. Irizarry*, 156 D.P.R. ___ (2002), **2002 J.T.S. 68**, a la pág. 1,108; *Pueblo v. González Román*, 138 D.P.R. 691, 707 (1995); *Pueblo v. Rosaly Soto*, 128 D.P.R. 729, 739 (1991); véase, además, Regla 110 de las de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 110.

El peso corresponde al Estado para establecer, más allá de duda razonable, los elementos del delito imputado, así como la conexión del acusado con los hechos y la intención o negligencia de éste. *Pueblo v. Irizarry*, **2002 J.T.S. 68**, a la pág. 1,109; *Pueblo v. Acevedo Estrada*, 150 D.P.R. 84, 99 (2000).

La prueba requerida no sólo tiene que ser suficiente en derecho, sino que debe ser satisfactoria, esto es, capaz de producir "*certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido*". *Pueblo v. Acevedo Estrada*, 150 D.P.R. a la pág. 100; *Pueblo v. González Román*, 138 D.P.R. a la pág. 707; *Pueblo v. Cabán Torres*, 117 D.P.R. 645, 652 (1986).

La duda razonable, según ha aclarado el Tribunal Supremo de Puerto Rico, es aquella insatisfacción o intranquilidad en la conciencia del juzgador sobre la culpabilidad del acusado una vez desfilada la prueba. *Pueblo v. Torres Rivera*, 129 D.P.R. 331, 341 (1991).

Esto no implica que deba destruirse toda duda posible, sea especulativa o imaginaria, ni que la culpabilidad del acusado tenga que establecerse con certeza matemática. *Pueblo v. Rosario Reyes,* 138 D.P.R. 591, 598 (1995); *Pueblo v. Pagán, Ortiz*, 130 D.P.R. 470, 480 (1992); *Pueblo v. Bigio Pastrana,* 116 D.P.R. 748, 761 (1985). Sólo se exige que la prueba brinde la certeza moral que convence, dirige la inteligencia y satisface la razón. *Id.*

No obstante, en los casos de que la prueba no establezca la culpabilidad más allá de duda razonable, no puede prevalecer una sentencia condenatoria. *Pueblo v. Acevedo Estrada*, 150 D.P.R. a las págs. 100-101; *Pueblo v. González Román*, 138 D.P.R. a la pág. 708; *Pueblo v. Maisonave Rodríguez,* 129 D.P.R. 49, 63 (1991).

En tales circunstancias, la revisión de la determinación sobre culpabilidad del acusado se considera una cuestión de derecho. *Pueblo v. Acevedo Estrada*, 150 D.P.R. a la pág. 100; *Pueblo v. González Román*, 138 D.P.R. a la pág. 708; *Pueblo v. Cabán Torres*, 117 D.P.R. a la pág. 653.

En el caso de autos, el apelante fue hallado culpable por el delito de asesinato en primer grado, según tipificado en el Código Penal de 1974, 33 L.P.R.A. secs. 4001 y 4002, así como por los delitos de escalamiento agravado, 33 L.P.R.A. sec. 4277, robo, 33 L.P.R.A. sec. 4279, y restricción a la libertad agravada, 33 L.P.R.A. sec. 4172.

El Art. 82 del Código Penal de Puerto Rico definía el asesinato como dar muerte a un ser humano con malicia premeditada. 33 L.P.R.A. sec. 4001. Véanse, *Pueblo v. Rosario*, 160 D.P.R. ___ (2003), **2003 J.T.S. 167**, a la pág. 359; *Pueblo v. Torres Rodríguez*, 119 D.P.R. 730, 739 (1987); véase, además, *Pueblo v. Castro García*, 110 D.P.R. 644, 646 (1981).

El concepto de malicia premeditada implica la ausencia de justa causa o excusa al ocasionar la muerte y la intención de ocasionar la muerte de un semejante. *Pueblo v. Rosario*, **2003 J.T.S. 167**, a la pág. 359; *Pueblo v. Carmona, Rivera*, 143 D.P.R. 907, 914 (1997); *Pueblo v. Rivera Alicea,* 125 D.P.R. 37, 45-46 (1989); *Pueblo v. Torres Montañez*, 106 D.P.R. 125, 129 (1977).

La malicia premeditada se determina a base de los hechos, los actos y las circunstancias que rodean la muerte, la capacidad mental, la motivación, las manifestaciones y la conducta del acusado. *Pueblo v. Carmona, Rivera*, 143 D.P.R. a las págs. 914-915; *Pueblo v. Rivera Alicea*, 125 D.P.R. a la pág. 45; *Pueblo v. Gómez Nazario*, 121 D.P.R. 66, 73-75 (1988).

Cuando la muerte ha sido ocasionada con malicia premeditada, y el autor ha actuado, además, con deliberación, el asesinato se considera de primer grado grado. 33 L.P.R.A. sec. 4002. *Pueblo v. Rosario*, **2003 J. T.S. 167**, a la pág. 359; *Pueblo v. Rivera Alicea*, 125 D.P.R. a las págs. 45-46; *Pueblo v. Torres Montañez*, 106 D.P.R. a la pág 129; *Pueblo v. Blanco*, 77 D.P.R. 767, 773-774 (1954).

La deliberación es la resolución de matar después de darle alguna consideración. *Pueblo v. Torres Montañez,* 106 D.P.R. a la pág. 129; *Pueblo v. Rosario*, 67 D.P.R. 371, 375 (1947). ■

El Art. 170 del Código Penal de 1974 tipificaba el delito de escalamiento, castigando a toda persona que "*penetrare en una casa, un edificio u otra construcción o estructura, o sus dependencias o anexos, con el propósito de cometer cualquier delito de apropiación ilegal o cualquier delito grave.*" 33 L.P.R.A. ssecs. 4276; véase, *Pueblo v. Hernández Solís*, 110 D.P.R. 388, 390 (1980); *Pueblo v. Arroyo Cortés*, 100 D.P.R. 341, 344 (1971); *Pueblo v. Soriano Rodríguez*, 92 D.P.R. 46, 47-49 (1965); *Pueblo v. Rosado*, 76 D.P.R. 387, 389 (1954).

El Art. 171 del Código establecía la modalidad agravada de este delito cuando, entre otras circunstancias, el delito fuese cometido de noche, en una casa, edificio o estructura habitada, si la persona estuviese armada o con algún arma mortífera o capaz de ocasionar grave daño corporal o si al cometer el crimen, se causare o intentare causar daño corporal. 33 L.P.R.A. sec. 4277.

El Art. 173 castigaba por robo a toda persona que "*se apropiare ilegalmente de bienes muebles pertenecientes a otra, ya sustrayéndolos de su persona, ... ya de su inmediata presencia y contra su voluntad por medio de violencia o de la intimidación.*" 33 L.P.R.A. sec. 4279. *Pueblo v. González Olivencia*, 116 D.P.R. 614, 617 (1985); *Pueblo v. Batista Montañés*, 113 D.P.R. 307, 313-314 (1982); *Pueblo v. Lucret Quiñones*, 111 D.P.R. a la pág. 739 (1981); *Pueblo v. Echevarría Lazú*, 95 D.P.R. 556 (1967).

El Art. 130 del Código Penal de 1974, por su parte, castigaba por el delito de restricción de libertad a "*[t]oda persona que, de cualquier modo, restringiere ilegalmente la libertad de otra, con conocimiento la víctima de la restricción.*" 33 L.P.R.A. sec. 4172; *Pueblo v. Robledo*, 127 D.P.R. 964, 972 (1991).

El Art. 131 establecía la modalidad agravada del delito cuando, entre otras circunstancias, los actos fuesen cometidos con violencia o intimidación o cuando la víctima sufriere grave daño corporal. 33 L.P.R.A. sec. 4172.

El Art. 35 del Código Penal de 1974 dispone que se consideraban autores de un delito, no sólo los que toman parte directa en su comisión, sino también los que "*fuerzan, provocan, instigan, inducen o ayudan a otra persona a cometer el delito*" y "*[l]os que cooperaren de cualquier otro modo en la comisión del delito*". 33 L.P.R.A. 3172; *Pueblo v. Pagán, Ortiz*, 130 D.P.R. a la pág. 478; *Pueblo v. Ortiz Martínez*, 116 D.P.R. 139, 145 (1985); *Pueblo v. Lebrón Morales*, 115 D.P.R. 113, 116 (1984); *Pueblo v. Lucret Quiñones*, 111 D.P.R. a la pág. 742; *Pueblo v. Ortiz*, 104 D.P.R. 115, 119 (1975); *Pueblo v. Agosto Castro*, 102 D.P.R. 441, 444-445 (1974).

En la situación de autos, el veredicto de culpabilidad del jurado por los delitos mencionados se encuentra sostenido por la prueba desfilada por el Ministerio Público, y en particular, por el testimonio de José Luis Delgado, quien fue un coautor de los hechos.

Dicho testigo declaró que el apelante participó en el escalamiento de la casa de la víctima, y que colaboró con los otros cuando éstos amarraron a la víctima, la agredieron y le prendieron fuego. Se trató de un ataque premeditado, con la intención deliberada de causarle grave daño corporal. Las lesiones sufridas por la víctima provocaron su muerte eventual. El testigo Delgado declaró que el apelante también participó con los demás en la apropiación de varias pertenencias de la víctima, que fueron robadas por los asaltantes de su inmediata presencia.

La declaración de este testigo fue corroborada por la evidencia presentada por el Fiscal sobre los hallazgos de los agentes del Orden Público en la escena del crimen. Esta prueba tendió a sustentar los detalles de lo relatado por el testigo Delgado y a confirmar que éste estuvo presente durante el ataque contra la víctima. De particular importancia para establecer la conexión del apelante con los hechos y para confirmar la versión del testigo del Pueblo sobre el asalto lo fue el hecho de que al apelante le fue ocupado el teléfono celular que fue hurtado a la víctima la noche del asalto.

El apelante intentó establecer que él había comprado el teléfono en cuestión a otro de los asaltantes luego de los hechos, pero el jurado descartó dicha prueba porque entendió que era contradictoria.

En particular, el testigo Irving Daniel Carrasquillo Oliveras ["*Danny*"] declaró que él le había vendido el celular al apelante en el pueblo de Gurabo y que anteriormente no lo conocía. Pero cuando el apelante fue intervenido por la Policía e interrogado sobre la procedencia del teléfono, llevó a los agentes a la casa de Danny, lo que es inconsistente con la versión del testigo de que no se conocían.

La agente Limaris Cruz también declaró que había investigado las llamadas realizadas al celular de la víctima después del robo y que la primera de ellas correspondía a un número ubicado en el cerro de Gurabo, que era el área donde vivía Danny. El apelante estaba en ese número, a pesar de que era la 1:00 de la mañana. La agente Cruz relató que al ser confrontado, el apelante *"se puso bien nervioso"* y le dijo a la agente Cruz que él estaba ahí por casualidad, lo que evidentemente no era cierto.

Al apelante se le mostró una fotografía de Danny y declinó identificarlo, lo que resultaba incompatible con su relato. La Policía entendió que el apelante estaba tratando de encubrir el delito, y que esto era señal de su culpabilidad. Esta apreciación se vio confirmada por la conducta del apelante de darse a la fuga cuando se le fue a diligenciar la orden de arresto.

La norma es que la aquilatación de la prueba corresponde al juzgador de los hechos de Primera Instancia. Las determinaciones del Tribunal de Primera Instancia merecen deferencia por parte de este Tribunal y no deben de ser modificadas, en ausencia de pasión, prejuicio, parcialidad o error manifiesto. *Pueblo v. Somarriba García*, 131 D.P.R. 462, 472 (1992); *Pueblo v. Maisonave Rodríguez*, 129 D.P.R. a las págs. 62-63; *Pueblo v. Echevarría Rodríguez I*, 128 D.P.R. 299, 316 (1991).

El apelante alega que el Tribunal de Primera Instancia erró al conferir peso al testimonio José Luis Delgado. El apelante alega que la declaración de dicho testigo fue inconsistente en diversos particulares, por lo que no era digna de credibilidad.

En particular, el apelante señala que el testigo alegó que era adicto y que necesitaba ingerir droga cada hora u hora y media, pese a lo cual declaró que había participado en el asalto a la residencia de la víctima el cual había tenido lugar muchas horas después de consumir droga. El apelante alega que las distintas pruebas científicas realizadas en la escena del crimen no lo conectaron con el delito, sino que, por el contrario, resultaron exculpatorias.

El apelante señala que el testigo Delgado declaró que él era *"tecato"*, pese a lo cual el Ministerio Público no pudo establecer que el apelante fuese un usuario de heroína, como lo era dicho testigo. El apelante se queja de que los agentes del Orden Público nunca investigaron la existencia de otra persona apodado *"Quenepo"* en el Municipio de Gurabo, quien era usuario de drogas y allegado de Delgado. El apelante señala que dicha prueba hubiera arrojado una duda razonable sobre si el testigo lo estaba acusando a él para no implicar a esta persona.

Es al juzgador de los hechos al que le corresponde adjudicar la credibilidad de los testigos en un caso. *Pueblo v. Chévere Heredia*, 139 D.P.R. 1, 15 (1995); *Pueblo v. Pagán, Ortiz*, 130 D.P.R. a la pág. 483.

La declaración de un testigo que merezca la credibilidad del Tribunal de Primera Instancia es suficiente en nuestro ordenamiento para establecer cualquier hecho. *Pueblo v. Mejías*, 160 D.P.R. ___ (2003), **2003 J.T.S. 126**, a la pág. 1,336; *Pueblo v. Chévere Heredia*, 139 D.P.R. a la pág. 15; *Pueblo v. Rodríguez Román*, 128 D.P.R. 121, 128 (1991); *Pueblo v. Acevedo Quiñones*, 100 D.P.R. 894, 899 (1972); véase, además, 32 L.P.R.A. Ap. IV, R. 10 (D).

El sólo hecho de que existan contradicciones en la declaración de un testigo, de por sí, no justifica que se rechace dicha declaración en su totalidad si las contradicciones no son decisivas y si el resto del testimonio es suficiente para establecer la transacción delictiva, superar la presunción de inocencia y establecer la culpabilidad más allá de duda razonable. *Pueblo v. Chévere Heredia*, 139 D.P.R. a la pág. 15; *Pueblo v. Pagán, Ortiz*, 130 D.P. R. a la pág. 483; *Pueblo v. Rodríguez Román*, 128 D.P.R. a la pág. 129; *Pueblo v. Ramos y Álvarez*, 122 D.P.R. 287, 317 (1988) *Pueblo v. Mattei Torres*, 121 D.P.R. 600, 609 (1988).

La máxima *falsus in uno, falsus in ómnibus* no autoriza a rechazar toda declaración de un testigo porque se

haya contradicho o faltara a la verdad en parte de su testimonio. *Pueblo v. Pagán, Ortiz,* 130 D.P.R. a la pág. 483.

En el presente caso, hemos considerado el récord, y no estamos en posición de sustituir el criterio del Tribunal de Primera Instancia. Lo cierto es que, según hemos indicado, la prueba tendió a establecer que el testigo Delgado fue un coautor de los hechos. Dicho testigo así lo admitió e inculpó al apelante como uno de los participantes.

El apelante alega que, por tratarse de un coautor, este testimonio debía ser considerado con cautela por el Tribunal. *Pueblo v. Acevedo Estrada,* 150 D.P.R. a la pág. 93; *Pueblo v. Jorge, Marcial,* 149 D.P.R. 832, 835-836 (1999); *Pueblo v. Camilo Meléndez,* 148 D.P.R. 539, 558-559 (1999); *Pueblo v. Rivera Rodríguez,* 123 D.P.R. 467, 480-481 (1989); *Pueblo v. Sanabria Pérez,* 113 D.P.R. 694, 696 (1983); *Pueblo v. Almodóvar,* 109 D.P.R. 117, 118-125 (1979); *Pueblo v. González del Valle,* 102 D.P.R. 374, 376 (1974); véase, además, la Regla 156 de las de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 156.

Aunque ello es cierto, no estimamos que el jurado hubiera errado al conferir credibilidad a dicho testigo.

La prueba reflejó que Delgado admitió los hechos, sin haber recibido inmunidad por parte del Ministerio Público por su participación en el delito. Al contrario, el testigo expresó que conocía que se le iba a acusar por los hechos. El récord también sugiere que él entendía que todos los participantes debían responder por sus actuaciones (*"allí estuvieron los cuatro y los cuatro van presos".*)

El Procurador General señala que las inconsistencias en el testimonio de Delgado son explicables debido a que dicho testigo sufre un grado de retardación. El récord reflejó que dicho testigo sólo había estudiado hasta el tercer grado *"en educación especial."* Delgado también había sido adicto, lo que pudo haber afectado su capacidad para articular sus ideas de manera más coherente.

Nuestra apreciación, según hemos indicado, es que la posesión por el apelante del teléfono que perteneció a la víctima constituye un factor incriminante decisivo que corrobora de manera categórica la versión del testigo del Pueblo, de que el apelante estuvo presente la noche de los hechos y participó en el crimen. Descartado el testimonio de Danny, de que él le vendió el teléfono al apelante (lo que pensamos el jurado podía hacer, por las razones que hemos expuesto anteriormente), la culpabilidad del apelante resulta evidente. ■

El apelante se queja de que el Tribunal de Primera Instancia excluyera el testimonio del Dr. Herrero. Dicho testigo fue presentado para intentar establecer que el apelante no era un adicto a heroína.

Según se explicara en la resolución emitida por este Tribunal el 13 de noviembre de 2003, en el recurso KLCE-2003-01398, el valor de este testigo no era claro, ya que él examinó al apelante muchos meses después de los hechos.

Tampoco entendemos que la contradicción que pretende establecer el apelante gire sobre algún punto esencial. Aunque el testigo Delgado hizo referencia a que el apelante era un *"tecato"*, el récord no refleja que las partes hubieran intentado aclarar este asunto.

Del récord ante este Tribunal no puede establecerse si, al ofrecer dicha caracterización, el testigo Delgado implicaba que el apelante era usuario de heroína, que tenía una dependencia física severa a esta sustancia, que la consumiera diariamente o que lo hiciera por medio de inyecciones, tal y como lo hacía el testigo. Ninguna de las partes abundó sobre lo anterior, por lo que no puede decirse que el testimonio del Dr. Herrera hubiera sido decisivo o sustancial en el caso. *Pueblo v. Rosaly Soto,* 128 D.P.R. a la pág. 745 (1991); *Pueblo v. Martínez Solís,* 128 D.P.R. 135, 162 (1991); *Pueblo v. Fradera Olmo,* 122 D.P.R. 67, 78-79 (1988); *Pueblo v. Franceschini Sáez,* 110 D.P.R. 794, 799 (1981); véase, además, la Regla 5 de las de Evidencia, 32 L.P.R.A. Ap. IV, R. 5. El error no

se cometió.

Por los fundamentos expresados, se confirma la sentencia apelada.

Lo pronunció y lo manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Laura M. Vélez Vélez
Secretaria del Tribunal de Apelaciones

**ESCOLIOS 2006 DTA 67**

**1.** Durante el juicio, el apelante ofreció el testimonio pericial del Dr. Gualberto Herrero Manzano. Este testimonio no fue admitido por el Tribunal de Primera Instancia. El apelante acudió ante este Tribunal de dicha determinación, recurso núm. KLCE-2003-01398. Mediante resolución emitida el 13 de noviembre de 2003, este Tribunal denegó el recurso presentado.

**2.** La exposición narrativa de la prueba refleja que para la fecha del juicio, el agente García Berríos había sido acusado por hechos no relacionados al caso de autos. El Tribunal instruyó al Fiscal y a los abogados del apelante de que este hecho no debía ser traído a la atención del jurado.

Durante el contrainterrogatorio del testigo, sin embargo, el abogado del apelante expresó ante el jurado que él "*lamenta[ba] la situación por la cual esta[ba] pasando*" el agente. Esto provocó una protesta del Ministerio Público y una amonestación por parte del Tribunal.

**3.** El Art. 83 del Código Penal de 1974 también establecía que constituye asesinato en primer grado, entre otros: "*toda clase de muerte ... cometida al perpetrarse o intentarse algún incendio agravado, violación, sodomía, robo, escalamiento, secuestro, estragos, mutilación o fuga.*" 33 L.P.R.A. sec. 4002.

Esta modalidad del delito es la que se conoce como asesinato estatutario ("*felony murder*"). La misma sólo requiere que se establezca que la causa próxima de la muerte fue uno de los delitos incluidos en el tipo legal o su tentativa. *Pueblo v. Robles González*, 132 D.P.R. 554, 564 (1993); *Pueblo v. Rivera Torres*, 121 D.P.R. 128, 134-135 (1988); *Pueblo v. Calderón Laureano*, 113 D.P.R. 574, 579 (1982); *Pueblo v. Lucret Quiñones*, 111 D.P.R. 716, 739-740 (1981).

En estos casos, el asesinato se produce "*por fuerza de ley.*" *Pueblo v. Rodríguez Rivera*, 84 D.P.R. 299, 303 (1961); véase, *Pueblo v. Jiménez Hernández*, 116 D.P.R. 632, 640 (1985). El Estado no tiene que presentar prueba sobre premeditación, deliberación o intención específica de matar. La intención del acusado es la de cometer el delito base, pero se le responsabiliza si ocurre una muerte, ya que se infiere que ha previsto que la consecuencia natural y probable de su acción es causar la muerte a otro. *Pueblo v. Robles González*, 132 D.P.R. a la pág. 564; *Pueblo v. Lucret Quiñones*, 111 D.P.R. a la pág. 740.

**4.** Luego de la presentación de su recurso, el apelante nos solicitó que se le autorizara la presentación de una moción de nuevo juicio, basada en la obtención de prueba exculpatoria adicional que no estaba disponible durante el juicio. Se trata del testimonio de Javier F. Sánchez González, quien declararía que conoce al apelante y al testigo Delgado. Dicho testigo alega que él era "*tecato*", que se le conoce por "*Caneca*" [¿"*Quenepa*"?], que él era quien se dedicaba a consumir drogas con el testigo Delgado y que al apelante no se le conocía con este apodo.

El propósito de dicha evidencia es sembrar dudas sobre la identificación del apelante realizada por Delgado.

Mediante resolución emitida el 23 de septiembre de 2005, denegamos la solicitud del apelante. No pensamos que la evidencia en cuestión sea efectivamente susceptible de producir un resultado diferente.